Thiago M. Coelho, SBN 324715
thiago@wilshirelawfirm.com
Binyamin I. Manoucheri, Esq., SBN 336468
binyamin@wilshirelawfirm.com
**WILSHIRE LAW FIRM**
3055 Wilshire Blvd., 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN ALCAZAR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FASHION NOVA, INC., a California corporation; and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. 4:20-cv-01434-JST<br><br>*Hon. Judge Jon S. Tigar*<br>Courtroom 6 – 2nd Floor<br><br>**DECLARATION OF KANNAN ARUMUGAM IN SUPPORT OF PLAINTIFF JUAN ALCAZAR'S REPLY TO DEFENDANT FASHION NOVA, INC.'S OPPOSITION TO PLAINTIFF JUAN ALCAZAR'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:       April 14, 2022<br>Time:      2:00 p.m.<br>Dept.:      Courtroom 6, 2nd Floor<br><br>Complaint Filed: February 26, 2020<br>Trial Date: None |

1
DECLARATION OF KANNAN ARUMUGAM IN SUPPORT OF PLAINTIFF JUAN ALCAZAR'S REPLY TO DEFENDANT FASHION NOVA, INC.'S OPPOSITION TO PLAINTIFF JUAN ALACAZAR'S MOTION FOR CLASS CERTIFICATION

**DECLARATION OF KANNAN ARUMUGAM**

I, Kannan Arumugam, hereby declare as follows:

1. I am an Americans with Disabilities Act ("ADA") consultant with over fifteen years of experience in website accessibility. I have expertise in W3C Accessibility Guidelines, WCAG 2.1 A, AA, and AAA, and Section 508 standards. I have hands-on, in-depth knowledge of screen-reading software, including JAWS, Window Eyes, NVDA, Voiceover, and Talkback. I am certified in JAWS screen reader. I have expertise in guiding developers, testers, designers, and editorial teams on Accessibility Recommendations. I also have experience in providing logic for accessibility automation tools. I provide this declaration in support of the Plaintiff Juan Alcazar's ("Plaintiff")Reply to Defendant Fashion Nova, Inc.'s ("Defendant") Opposition to Plaintiff's Motion for Class Certification, and, specifically, to rebut the allegations in Aaron Cannon's ("Mr. Cannon") declaration submitted on February 24, 2022 in support of Defendant's Opposition. (Dkt. 57-1).

2. On February 24, 2022, Mr. Cannon submitted a declaration in this case, in which he offered conclusory evidence to support the notion that visually impaired screen-reader users encountering a website have dissimilar experiences based on the web browser used, screen-reader employed, operating system and computer used, and user familiarity with said operating system, web browser, and screen-reader. (Dkt. 57-1).

3. As to Web Browsers: Mr. Cannon opines: "There are several commonly used browsers, each having dozens of versions, and many of these can vary widely in their support for accessibility, and to what degree they are supported by a given screen reader. Websites thus can be usable in one browser, but not in another." (Dkt. 57-1, ¶ 5).

4. Contrary to Mr. Cannons's representation, all browsers support accessibility in simple, similar ways.By conforming Defendant's website to the Web Content Accessibility Guildines ("WCAG") Defendant could ensure a uniform experience for all visually impaired users of screen-readers regardless of the respective browser chosen. Despite that all screen readers havesome variations in user interface panels and short-cut keys, all screen readers read the website's underlying programming code to convey the information in similar ways. Having said

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

that, the issue with the Defendant's website is that its programming code does not follow WCAG, and thereby it fails to be ADA compliant. The WCAG is a standard that applies equally to all screenreaders, as screenreaders are programmed to read the code regardless of the browser the individual visually impaired user employs. Indeed, Defendant's refusal to code its website pursuant to WCAG, despite its knowledge that its website does not conform to WCAG, guarantees that every visually impaired user employing any browser cannot access the website in a full and equal manner to sighted individuals—denying them the services and goods of Defendant's brick-and-mortar stores.

5.   Importantly, Mr. Cannon does not even make a definite statement, instead choosing to use the word "*can* vary widely in their support for accessibility and to what degree they are supported by a given screen reader." (Cannon Decl., ¶. 5). The questions remain, does this situation present itself, if at all, what are the underlying causes of said effect, on what browsers, which versions of the browsers, and under what circumstances. Moreover, Mr. Cannon's statement: "vary widely in their support for accessibility" is wholly illusory. The question, how do the browsers vary widely in their support for accessibility, is left open.

6.   Mr. Cannon also fails to opine on whether the website is WCAG compliant. My declaration stated that the website is not WCAG compliant, and that conclusion is supported by the third-party audits paid for by Defendant, as well as my own. Accordingly, Mr. Cannon's declaration is off base because he does not address the fact at hand—that the website is not WCAG compliant—and the consequences of Defendant's failure to ensure its website is WCAG compliant. Defendant's failure to do so ensured that visually impaired persons such as Plaintiff and the *putative* Class Members each encountered a substandard website and would have had a similar experience—regardless of the browser chosen. Significantly, the WCAG do not provide for distinct coding requirements for the type of web browser which the visually impaired screen-reader user employs. The absence of this requirement from the WCAG is an indicia that the type of browser used by the respective visually impaired screen-reader user does not have a significant affect on the experience of the website for visually impaired users of screen-readers. For if it did, then the WCAG, which is

industry best practice in the United Sates, as agreed to by Roger Satur, Fashion Nova's 30(b)(6) witness, during his deposition, would have certainly included requirements to have several different coding methods so that visually impaired users of screen-readers using any browser could access websites in a fair and equal manner to sighted individuals.

7. This conclusion is supported by the underlying goals of developing WCAG. WCAG was developed with the "goal of providing a single shared standard for web content accessibility that meet the needs of individuals, organizations, and governments internationally."https://www.w3.org/WAI/standardsguidelines/wcag/#:~:text=Web%20Content%20Accessibility%20Guidelines%20(WCAG)%202%20is%20developed%20through%20the,%2C%20organizations%2C%20and%20governments%20internationally. WCAG developers sought to create shared guidelines for developers to use in order to assure a uniform experience for all visually impaired screen-reader users, regardless of web browser chosen. This goal could not be achieved if, in fact, the coding on the website—even if 100% compliant—could not provide sufficient access to visually impaired users of screen-readers if they employ certain web browsers as opposed to others. WCAG developers certainly took this into account when deciding not to provide different standards for website coding depending on the web browser which a visually impaired screen-reader user uses.

8. Regardless of the respective browser chosen, if a visually impaired user of a screen-reader encountered a deficiently coded website, like Defendant's, the visually impaired user could not access the website due to the barriers encountered. That was the exact case here.

9. As to screen readers, Mr. Cannon testifies:

    a. "It is not uncommon to find websites that work with one screen reader but do not work with another. In his complaint, Plaintiff mentions the JAWS screen reader, which receives minor updates every few months, and major updates every year. Unfortunately, the screen reader is not free, and the licensing costs start at $95 per year. As a result, it is not uncommon to find people using JAWS versions that are several years out of date. The problem with this situation is

that these older screen readers do not support newer web technologies that can enhance accessibility. In addition, they may have difficulty interpreting the information provided by newer web browsers. As a result, different screen readers, and even different versions of the same screen reader, can vary widely in how much access they provide to a particular website."(Cannon Decl., ¶. 6).

That is wrong.

10. Mr. Cannon claims that the licensing fee for JAWS software costs $95 a year and, as a result, "it is not uncommon to find people using JAWS versions that are several years out of date."However, this conclusion predicated on these facts is not warranted because the license term expires on the purchase anniversary date, meaning that any JAWS user who purchases a $95 annual subscription must again pay $95 by the purchase anniversary date of the software or it will be inaccessible to them.  Version upgrades are included during the license term, so that any update that comes out during the year of the license term is provided as part of the original purchase price.  Thus, if the JAWS user does not renew the annual payment they cannot use the software further, and if they do renew their annual license, any upgrades are provided to the user that comes out in that year.  Accordingly, any visually impaired user of JAWS that pays for an annual license term, is provided the most recent updates of JAWS during that annual cycle.

11. But even if a JAWS user purchased the perpetual license, which does not receive monthly updates and requires an optional software maintenance agreement for version upgrades, Mr. Cannon's claim that visually impaired users of screen readers using older versions of JAWS would encounter issues, is far from the truth.  I checked every update all the way from JAWS 4, year 2000 to 2022, and JAWS updates do not directly impact the WCAG and the coding of the webpage, instead, they are made to improve the user's experience with JAWS. For example, in JAWS 2022, one of the updated features is that "The default wake word for JAWS is now 'Hey Sharky.'"Or "Earlier in JAWS and Fusion 2021, we introduced a way for users to lower the volume of JAWS speech independently of system audio to help make it easier to hear audio from other applications. Version 2022 takes this a step further by

now allowing those using stereo headsets or speakers to route all JAWS or Fusion speech to one ear while routing audio from all other applications to the other ear."[1] As opposed to a lack of update not allowing for a JAWS user to properly read a website that is WCAG compliant, a JAWS user of an older version of JAWS would only not possess the features which cosmeticcaly improves the user experience, but that fact would not affect the overarching experience, as Mr. Cannon opines.  Every single WCAG update is listed at: https://support.freedomscientific.com/downloads/jaws/JAWSWhatsNewand *not one* includes even a mention about WCAG, as they are all created so that it works with accessibility and likewise, the coding of webpages.

12. Mr. Cannon's claim that "[t]he problem with this situation is that these older screen-readers do not support newer web technologies that can enhance accessibility" is belied by the facts of this case. (Cannon Decl., ¶. 6, lines 27-28).  Has Defendant incorporated "newer web technologies" on its website?  If so, what "newer web technologies" is Mr. Cannon speaking of?  From my close examination of the website, Defendant is not WCAG compliant, much less incorporated "newer web technologies." Accordingly, even if I assumed that new web technologies do not support older screen-readers, this fact does not change the facts of this case, as no "newer web technologies" have or were applied by Defendant.If users cannot afford to purchase JAWS, they need not use any old screen readers, as they can always use the screen-reader "NVDA"—which is available free of charge and works extremely-well. NVDA wasfounded by blind persons, and regular version updates, such as the latest updated version on March 24, 2022, is also totally free.  NVDA can provide its services free of charge (as its costs are paid by companies that support WCAG).NVDA can read a website's code to allow for WCAG compliant websites to be fully accessible to legally blind individuals (as do all screenreaders).

13. Significantly, Mr. Cannon makes no allegations that the website was or is WCAG compliant.  Nor does Mr. Cannon address the question of the overarching experience that actualClass Members share because of Defendant's failure to make its website WCAG

---

[1] https://support.freedomscientific.com/downloads/jaws/JAWSWhatsNew

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

compliant. It is my testimony that, regardless of the respective screen-reader used, that any visually impaired person using a screen-reader would not be able to use a website, like Defendant's, if the website does not have the proper coding in place.

14. As to operating systems and computers, Defendant attests that:

   a. "The operating system and computer can impact not only what browser or screen reader the user can run, but even how well their screen reader works. For example, some screen readers will not work as well if the user has a particular video card or display driver installed. A video card is a device that allows a computer to communicate with a monitor, and a display driver is the software that makes the video card function. For example, many users are surprised to learn that Chrome and Firefox, two browsers that often work well with screen readers on Windows, do not work at all well on MacOS with the VoiceOver screen reader."(Cannon Decl., ¶. 7).

15. Mr. Cannon's testimony as to operating systems and computers chosen and their alleged affect on the experience of visually impaired users to the website is again illusory. Mr. Cannon claims that: "some screen readers will not work as well if the user has a particular video card or display driver installed." First, what particular video card or display driver needs to be installed in Plaintiff's and the *actual* Class Members' computers for the screen-readers to not work "as well"? In what computers are these video cards or display drivers installed? How many of these computers have been sold? Does it have potential to affect a large subset of the Class Members or very few? If Mr. Cannon provided the names of the aforementioned video card or display driver these questions could be more easily garnered. Moreover, Mr. Cannon does not explain what it means for some screen-readers to not work "as well."

16. Moreover, as an expert consultant for web developers working on website ADA compliance, I can attest that WCAG does not provide guidelines on coding methods for computers with different operating systems, video cards, or display dirvers and for good reason. If these factors had a measurable affect on visually impaired users of screen-readers

experience on websites, WCAG developers would have created a tiered system of coding so that all users of screen-readers could access websites in a similar manner. In short, the *actual*Class Members share a similar experience on the website because they encountered a website that was not properly coded. Even if *actual* Class Members used voiceover with a MacOS operating system on google chrome or firefox they could not have accessed the goods and services of Defendant's business because the lack of sufficient coding denied them that ability.

17. As to user familiarity with computers, web browsers, and screen readers, Mr. Cannon states:

> a. "The task that screen reading software has to perform is quite complex. In short, it has toconvey two-dimensional information—such as the content of a webpage—into a one-dimensional stream of speech. While most screen reader developers do their best to hide this complexity from users, this only goes so far, and—in spite of these efforts—screen readers require a fair amount of training and experience to use well. Many screen reader users will join discussion forums to share suggestios on how to use their screen readers, and it is not uncommon for one screen reader user to be able to use a website, and another to not be able to do so. Sometimes this problem is resolved by the sharing of a few tips, and other times it is not, due to software or other differences. Unfortunately, individual users are not always good judges of their own skill level. As an example, in his complaint, Plaintiff mentions having issues due to missing alternative text. However, it is not clear if he is ware or attempted to utilize the image recognition features in his screen reader or web browser. Likewise, he also mentions empty links, but did not mention whether or not he used any features of his screen reader to determine where the links led." (Cannon Decl., ¶. 8).

18. Mr. Cannon again fails to address the result of Defendant's failure to ensure its website is WCAG compliant. Mr. Cannon is correct to assert that different users of screen-

readers have different skill levels. However, no matter the degree of skill or lack thereof of the *actual* Class Members, the common shared experience remained the same because they all encountered a website which was so inherently flawed that no matter their individual skill levels, the website is not capable of being navigated correctly.

19. On April 6, 2022, I revisited the website and retested the website against the WCAG 2.0/2.1 Level AA and I found numerous barriers to access—leading me to the conclusion that the website is compliant with WCAG 2.0/2.1 Level AA guidelines—and by extension the ADA. Among the issues I discovered on the website were: (1) Heading level one is not present **(**Failure of WCAG 2.4.6: Headings and Labels), (2) multiple unlabelled buttons (Failure of WCAG 3.3.2 Labels or Instructions),  (3) links could not be determined (Failure of WCAG 2.4.4: Link Purpose), (4)color contrast failure of text against its background (Failure of WCAG 1.4.3 Contrast (Minimum), (5)no visual keyboard focus indicators (Failure of WCAG 2.4.7 Focus Visible), (6)state of the UI controls are not conveyed (Failure of WCAG 4.1.2 Name, Role, Value), (7) landmark names are not unique (Failure of WCAG 1.3.1 Info and Relationships), (8) list structure does not have the required children (Failure of WCAG 1.3.1 Info and Relationships), (9) current page information is not communicated (Failure of WCAG 4.1.3 Name, Role, Status), and(10) buttons are not keyboard accessible (Failure of WCAG 2.1.1 Keyboard accessible).Mr. Cannon's testimony that he "was able to explore products, add those products to [his] cart, apply a coupon code, and proceed through the checkout process with a screen reader—all without assistance of any kind[,]" is misleading. Had Mr. Cannon used a keyboardto add a product using the "Quick add" buttons (something that is available to all products at Fashion Nova), he would have found that the button to add those particular products to cart and to purchase,are not accessible for visually impaired screen reader users. The reason for that is because the buttons appear only when the mouse is hovered on the button itself. Of course, legally blind individuals would not know where to hover their mouse, as they cannot see where the button is located. Mistakes and conclusory statements such as this are the reason why I feel as if Mr. Cannon did not take the appropriate time to actually provide a declaration that would help theCourt in this

case. Had he spent the time, he would have mentioned that it was undisputed that Fashion Nova's website is not WCAG compliant, and that virtually any legally blind individual would not be able to experience the website in a manner which would make it possible for them to access their stores, to purchase, browse for products, add products to cart, apply coupon codes, andcheckout.

I declare, under penalty of perjury, under the laws of the State of California and the United States, that the foregoing is true and correct.

Executed April 6, 2022, in Los Angeles, California.

_____
Kannan Arumugam

**CERTIFICATE OF SERVICE**

I, Thiago M. Coelho, an attorney, certify that I caused the foregoing document to be served on all counsel of record in this action via the Court's CM/ECF system on April 6, 2022.

/s/ Thiago M. Coelho
Thiago M. Coelho Esq.
**WILSHIRE LAW FIRM, PLC**
*Attorney for Plaintiffs*