# Exhibit B

1                  IN THE UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4     JUAN ALCAZAR, individually and on  )

      behalf of all others similarly     )

5     situated,                          )

           Plaintiff,                    )

6                                        )  Case No.:

        vs.                              )  4:20-cv-01434-JST (DMR)

7                                        )

      FASHION NOVA, INC., a California   )

8     corporation; and DOES 1 to 10,     )

      inclusive,                         )

9          Defendants.                   )

      _____)

10

11

12

13     VIDEO-RECORDED REMOTE DEPOSITION OF ROBERT D. MOODY

14                        Davie, Florida

15          Thursday, October 26, 2023; 12:06 p.m.

16

17

18               TAKEN IN BEHALF OF THE DEFENDANT

19

20

21

22     REPORTED BY:

23     Victoria A. Guerrero, CSR, RDR, RMR, CRR

24     Job No. 6161775

25     Pages 1 through 243

                                              Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4    JUAN ALCAZAR, individually and on  )
      behalf of all others similarly     )
 5    situated,                          )
             Plaintiff,                  )
 6                                       )  Case No.:
          vs.                            )  4:20-cv-01434-JST (DMR)
 7                                       )
      FASHION NOVA, INC., a California    )
 8    corporation; and DOES 1 to 10,     )
      inclusive,                         )
 9           Defendants.                 )
      _____  )

10

11

12

13

14

15         BE IT REMEMBERED that, pursuant to Federal

16    Rules of Civil Procedure, the deposition of ROBERT

17    D. MOODY was taken before Victoria A. Guerrero,

18    California Certified Shorthand Reporter, Registered

19    Diplomate Reporter, Registered Merit Reporter, and

20    Certified Realtime Reporter, on Thursday, October

21    26, 2023, commencing at the hour of 12:06 p.m.,

22    the witness responding to questions by

23    videoconference from Davie, Florida; the questions

24    being propounded and proceedings reported remotely

25    via videoconference.
```

                                                    Page 2

1    R E M O T E   A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:

4

             WILSHIRE LAW FIRM, PLC
5            THIAGO COELHO
             3055 Wilshire Boulevard, Twelfth Floor
6            Los Angeles, California  90010
             P 213.381.9988  F 213.381.9989
7            rvinson@wilshirelawfirm.com
             thiago@wilshirelawfirm.com

8

9

10   FOR THE DEFENDANT:

11

             SIDLEY AUSTIN LLP
12           ANNA TUTUNDJIAN
             ERIC SCHWARTZ
13           555 West Fifth Street, Suite 4000
             Los Angeles, California  90013
14           P 213.896.6666  F 213.896.6600
             atutundjian@sidley.com
15           eschwartz@sidley.com

16

17

18   ALSO PRESENT:

19           Scott Slater, Videographer

20

21

22

23

24

25

                                        Page  3

| | | |
|---|---|---|
| 1 | are not unique to visually impaired individuals? | 13:29:38 |
| 2 | A    One more time, please. | 13:29:41 |
| 3 | Q    So your conclusions in identifying what | 13:29:49 |
| 4 | accessibility issues on Fashion Nova's website are | 13:29:52 |
| 5 | not -- sorry.  Strike that. | 13:29:55 |
| 6 | So your conclusions in identifying the | 13:29:58 |
| 7 | accessibility issues on Fashion Nova's website are | 13:30:00 |
| 8 | not unique to visually impaired individuals? | 13:30:02 |
| 9 | MR. COELHO:  Objection.  Misstates | 13:30:11 |
| 10 | testimony.  Misleading.  You can answer. | 13:30:12 |
| 11 | THE WITNESS:  I think the issues on | 13:30:15 |
| 12 | Fashion Nova's website exist that impact | 13:30:21 |
| 13 | visually impaired users would be unique to | 13:30:25 |
| 14 | those users.  There's just more than one issue. | 13:30:30 |
| 15 | So I hope that answered the question because | 13:30:38 |
| 16 | otherwise I don't know how to answer your | 13:30:40 |
| 17 | question. | 13:30:42 |
| 18 | The issues -- the issues that exist that | 13:30:42 |
| 19 | impact a visually impaired person are unique to | 13:30:45 |
| 20 | those people.  Okay?  There's just -- more than | 13:30:50 |
| 21 | just one issue. | 13:30:52 |
| 22 | BY MS. TUTUNDJIAN: | 13:30:53 |
| 23 | Q    My question is slightly different.  If your | 13:30:54 |
| 24 | analysis as you've now testified was that you were | 13:30:57 |
| 25 | auditing Fashion Nova's website to determine whether | 13:31:00 |

Page 42

| | | |
|---|---|---|
| 1 | or not any disabled person had accessibility issues, | 13:31:03 |
| 2 | then your methodology and conclusions relate | 13:31:08 |
| 3 | generally to people with disabilities. | 13:31:12 |
| 4 | In other words, they are not specific to | 13:31:17 |
| 5 | individuals who are visually impaired. | 13:31:18 |
| 6 | MR. COELHO:  Objection.  Misstates prior | 13:31:22 |
| 7 | testimony.  Asked and answered.  You can | 13:31:25 |
| 8 | answer. | 13:31:29 |
| 9 | THE WITNESS:  I believe my testimony and | 13:31:31 |
| 10 | my report show that my methodology and my audit | 13:31:35 |
| 11 | of the Fashion Nova website was to test the | 13:31:41 |
| 12 | website for compliance with WCAG and whether or | 13:31:46 |
| 13 | not barriers existed for disabled people | 13:31:54 |
| 14 | including visually disabled people. | 13:31:57 |
| 15 | My conclusion is that barriers exist and | 13:32:01 |
| 16 | that the barriers exist on several levels and | 13:32:06 |
| 17 | they would affect people with different | 13:32:09 |
| 18 | disabilities including visually impaired and | 13:32:17 |
| 19 | others.  So my -- best I got. | 13:32:19 |
| 20 | BY MS. TUTUNDJIAN: | 13:32:37 |
| 21 | Q    So one of your opinions is that Fashion | 13:32:38 |
| 22 | Nova's website is not WCAG-compliant; is that | 13:32:39 |
| 23 | correct? | 13:32:46 |
| 24 | A    The website has barriers and it does have | 13:32:46 |
| 25 | issues with WCAG provisions. | 13:32:50 |

Page 43

| | | |
|---|---|---|
| 1 | my manual process. | 13:45:39 |
| 2 | BY MS. TUTUNDJIAN: | 13:45:41 |
| 3 | Q    For the automated review is what you mean? | 13:45:43 |
| 4 | A    Right. | 13:45:47 |
| 5 | MR. COELHO:  Objection.  Vague.  You can | 13:45:48 |
| 6 | answer. | 13:45:49 |
| 7 | BY MS. TUTUNDJIAN: | 13:45:51 |
| 8 | Q    Have courts accepted the WCAG Guidelines -- | 13:45:57 |
| 9 | MR. COELHO:  Objection.  Calls for -- | 13:46:04 |
| 10 | BY MS. TUTUNDJIAN: | 13:46:06 |
| 11 | Q    Sorry. | 13:46:06 |
| 12 | So have courts accepted WCAG Guidelines as | 13:46:07 |
| 13 | industry standard for determining web accessibility? | 13:46:10 |
| 14 | MR. COELHO:  Objection.  Calls for legal | 13:46:14 |
| 15 | conclusion.  You can answer. | 13:46:15 |
| 16 | THE WITNESS:  I believe it has, yes. | 13:46:20 |
| 17 | BY MS. TUTUNDJIAN: | 13:46:22 |
| 18 | Q    And have current agencies accepted WCAG | 13:46:29 |
| 19 | Guidelines as industry standards for assessing web | 13:46:32 |
| 20 | accessibility? | 13:46:39 |
| 21 | A    I don't know. | 13:46:41 |
| 22 | Q    Is it your opinion that Fashion Nova's | 13:46:47 |
| 23 | website is not ADA-complaint? | 13:46:50 |
| 24 | A    Yes. | 13:46:52 |
| 25 | Q    Do you have any specific legal training as | 13:46:57 |

Page 52

| | | |
|---|---|---|
| 1 | to ADA laws? | 13:46:59 |
| 2 | A    No. | 13:47:14 |
| 3 | Q    So what is your basis for concluding that | 13:47:14 |
| 4 | Fashion Nova's website is not ADA-complaint? | 13:47:17 |
| 5 | A    One more time, please. | 13:47:26 |
| 6 | Q    So what is your basis for determining that | 13:47:28 |
| 7 | Fashion Nova's website is not ADA-complaint? | 13:47:30 |
| 8 | A    Disabled people access the website and had | 13:47:40 |
| 9 | run into barriers which prevented them from using | 13:47:44 |
| 10 | the website.  I confirmed that the barriers existed | 13:47:47 |
| 11 | as well as others.  That WCAG standards weren't met. | 13:47:51 |
| 12 | That seems to be the standard that is being followed | 13:48:03 |
| 13 | for compliance and for meeting the ADA, but, but I'm | 13:48:09 |
| 14 | not trying to provide a legal interpretation here. | 13:48:20 |
| 15 | Q    Well, to be clear, your testimony is that | 13:48:28 |
| 16 | Fashion Nova's website is not ADA-complaint, right? | 13:48:30 |
| 17 | A    The ADA compliance of Fashion Nova requires | 13:48:36 |
| 18 | compliance with WCAG.  They're not WCAG-compliant. | 13:48:40 |
| 19 | That's my position. | 13:48:44 |
| 20 | Q    And one of the bases that you identified is | 13:48:44 |
| 21 | that disabled persons have barriers in accessing | 13:48:47 |
| 22 | Fashion Nova's website and therefore it is not | 13:48:50 |
| 23 | ADA-complaint? | 13:48:52 |
| 24 | MR. COELHO:  Objection.  Go ahead. | 13:48:57 |
| 25 | THE WITNESS:  That the barriers were -- | 13:49:01 |

Page 53

| | | |
|---|---|---|
| 1 | that the barriers were not WCAG-compliant so | 13:49:06 |
| 2 | yes, you're right.  So the barriers are not | 13:49:10 |
| 3 | compliant with WCAG and WCAG's required, as a | 13:49:13 |
| 4 | standard, for the site. | 13:49:20 |
| 5 | BY MS. TUTUNDJIAN: | 13:49:22 |
| 6 | Q    So any time a website is not | 13:49:22 |
| 7 | WCAG-compliant, it is considered not compliant with | 13:49:26 |
| 8 | the ADA laws? | 13:49:32 |
| 9 | MR. COELHO:  Objection.  Misstates prior | 13:49:34 |
| 10 | testimony.  You can answer.  Sorry.  Calls for | 13:49:35 |
| 11 | legal conclusion.  You can answer. | 13:49:38 |
| 12 | THE WITNESS:  Would you repeat that, | 13:49:43 |
| 13 | please? | 13:49:44 |
| 14 | BY MS. TUTUNDJIAN: | 13:49:44 |
| 15 | Q    Sure.  So any time a website is not | 13:49:44 |
| 16 | WCAG-compliant, it is considered not compliant with | 13:49:50 |
| 17 | ADA laws? | 13:49:55 |
| 18 | MR. COELHO:  Same objections. | 13:49:56 |
| 19 | THE WITNESS:  I'm going to need you to | 13:50:08 |
| 20 | rephrase the question because I don't quite | 13:50:09 |
| 21 | understand your question. | 13:50:11 |
| 22 | BY MS. TUTUNDJIAN: | 13:50:13 |
| 23 | Q    Sure.  You have concluded that Fashion | 13:50:13 |
| 24 | Nova's website is not ADA-complaint because disabled | 13:50:17 |
| 25 | persons have barriers, right, in accessing Fashion | 13:50:23 |

Page 54

| | | |
|---|---|---|
| 1 | Nova's website? | 13:50:29 |
| 2 | MR. COELHO:  Objection.  Vague and | 13:50:31 |
| 3 | confusing.  You can answer. | 13:50:31 |
| 4 | BY MS. TUTUNDJIAN: | 13:50:36 |
| 5 | Q    Let me break it down by your two bases as I | 13:50:37 |
| 6 | understand your testimony. | 13:50:39 |
| 7 | You testified that Fashion Nova's website | 13:50:39 |
| 8 | is not ADA-complaint and you offered two bases for | 13:50:41 |
| 9 | your opinion.  The first was that disabled persons | 13:50:44 |
| 10 | experience barriers in accessing Fashion Nova's | 13:50:48 |
| 11 | website and the second was that there are aspects of | 13:50:51 |
| 12 | Fashion Nova's website that are not WCAG | 13:50:55 |
| 13 | Guideline-adherent; is that correct? | 13:50:57 |
| 14 | A    I think you missed a step in there.  So I | 13:51:06 |
| 15 | did testify that the -- that disabled users accessed | 13:51:09 |
| 16 | Fashion Nova's website and ran into barriers.  Okay? | 13:51:14 |
| 17 | The barriers they ran into were not WCAG-compliant. | 13:51:23 |
| 18 | And WCAG compliance would be a requirement, at least | 13:51:28 |
| 19 | at the AA level.  And if it's not, then the website | 13:51:36 |
| 20 | would not be ADA-complaint. | 13:51:41 |
| 21 | Q    Okay.  And so my question was just that, | 13:51:45 |
| 22 | which is if a website is not WCAG-compliant then it | 13:51:48 |
| 23 | is not ADA-complaint? | 13:51:52 |
| 24 | MR. COELHO:  Objection.  Misstates | 13:51:55 |
| 25 | testimony.  Objection.  Vague and confusing. | 13:51:57 |

Page 55

| | | |
|---|---|---|
| 1 | You can answer, if you understand the question. | 13:52:00 |
| 2 | THE WITNESS:  A website that is not WCAG | 13:52:08 |
| 3 | 2A-compliant is not ADA-complaint, does not | 13:52:09 |
| 4 | comply with the ADA. | 13:52:17 |
| 5 | BY MS. TUTUNDJIAN: | 13:52:18 |
| 6 | Q    Did you have any experience relating to ADA | 13:52:29 |
| 7 | compliance for websites before working on this | 13:52:32 |
| 8 | matter? | 13:52:34 |
| 9 | A    Yes. | 13:52:34 |
| 10 | Q    What was the nature of your experience? | 13:52:37 |
| 11 | A    I have provided consulting services to | 13:52:48 |
| 12 | plaintiff attorneys and had audited other websites. | 13:52:54 |
| 13 | I have worked with defendant companies in bringing | 13:53:02 |
| 14 | their websites into compliance and have provided | 13:53:06 |
| 15 | post-settlement audits of sites as well as consulted | 13:53:13 |
| 16 | with those companies to bring themselves into | 13:53:20 |
| 17 | compliance. | 13:53:27 |
| 18 | Q    And about on average, how many companies | 13:53:32 |
| 19 | have you consulted with? | 13:53:35 |
| 20 | A    I don't understand in what capacity and -- | 13:53:43 |
| 21 | Q    In the capacity that we're talking about, | 13:53:48 |
| 22 | which is your relevant work experience in auditing | 13:53:50 |
| 23 | websites. | 13:53:56 |
| 24 | A    Are you asking me how many websites I've | 13:53:58 |
| 25 | audited? | 13:54:00 |

Page 56

| | | |
|---|---|---|
| 1 | testimony when we get there. | 14:18:49 |
| 2 | Okay.  So starting off with education, you | 14:18:52 |
| 3 | have three listed.  There's a Nova Southeastern | 14:18:54 |
| 4 | University where you obtained a Bachelor of Science | 14:18:59 |
| 5 | in 1990; is that right? | 14:19:03 |
| 6 | A    That is correct. | 14:19:07 |
| 7 | Q    And then the St. Thomas University School | 14:19:07 |
| 8 | of Law where you obtained the JD in 1993? | 14:19:10 |
| 9 | A    That's correct. | 14:19:17 |
| 10 | Q    Did you also end up taking the Bar exam? | 14:19:18 |
| 11 | A    No, I did not. | 14:19:20 |
| 12 | Q    So you never practiced as an attorney? | 14:19:24 |
| 13 | A    No, I'm not an attorney. | 14:19:27 |
| 14 | Q    And then we have the Oxford University | 14:19:31 |
| 15 | Global Business in 2017? | 14:19:35 |
| 16 | A    Yes. | 14:19:38 |
| 17 | Q    And so looking at all three educational | 14:19:49 |
| 18 | experiences, did you have any courses on web | 14:19:51 |
| 19 | accessibility? | 14:20:04 |
| 20 | A    No. | 14:20:05 |
| 21 | Q    Any courses on ADA compliance? | 14:20:05 |
| 22 | A    No. | 14:20:07 |
| 23 | Q    Any web accessibility training? | 14:20:07 |
| 24 | A    From the three listed under my education? | 14:20:10 |
| 25 | Q    Right. | 14:20:15 |

Page 67

| | | |
|---|---|---|
| 1 | A    No. | 14:20:15 |
| 2 | Q    Any ADA training? | 14:20:18 |
| 3 | MR. COELHO:  Objection.  Vague.  You can | 14:20:21 |
| 4 | answer. | 14:20:22 |
| 5 | BY MS. TUTUNDJIAN: | 14:20:26 |
| 6 | Q    Again, just focusing on your three | 14:20:26 |
| 7 | educational experiences. | 14:20:28 |
| 8 | A    I took a labor law course in law school and | 14:20:29 |
| 9 | I think there was an ADA component, but that was in | 14:20:32 |
| 10 | '93 so it's been a few years. | 14:20:36 |
| 11 | Q    Any workshops on web accessibility? | 14:20:40 |
| 12 | A    Yes.  But not associated with the three | 14:20:45 |
| 13 | under "Education." | 14:20:48 |
| 14 | Q    So just focusing on the three educational | 14:20:49 |
| 15 | ones right now. | 14:20:51 |
| 16 | A    So no.  So the answer is no. | 14:20:52 |
| 17 | Q    Any conferences on web accessibility? | 14:20:55 |
| 18 | MR. COELHO:  Objection.  Vague.  You can | 14:20:58 |
| 19 | answer. | 14:20:59 |
| 20 | THE WITNESS:  Based on the three | 14:21:01 |
| 21 | presented, no. | 14:21:02 |
| 22 | BY MS. TUTUNDJIAN: | 14:21:03 |
| 23 | Q    Any webinars on web accessibility? | 14:21:04 |
| 24 | MR. COELHO:  Objection.  Vague.  You can | 14:21:10 |
| 25 | answer. | 14:21:12 |

Page 68

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 14:21:12 |
| 2 | BY MS. TUTUNDJIAN: | 14:21:12 |
| 3 | Q    Any certifications on web accessibility? | 14:21:13 |
| 4 | A    No. | 14:21:16 |
| 5 | MR. COELHO:  Objection.  Vague.  You can | 14:21:17 |
| 6 | answer. | 14:21:18 |
| 7 | THE WITNESS:  No. | 14:21:20 |
| 8 | BY MS. TUTUNDJIAN: | 14:21:20 |
| 9 | Q    Moving on to your certifications.  You | 14:21:29 |
| 10 | identify six certifications on your CV; is that | 14:21:31 |
| 11 | right? | 14:21:34 |
| 12 | MR. COELHO:  Objection.  Document speaks | 14:21:35 |
| 13 | for itself.  You can answer. | 14:21:36 |
| 14 | THE WITNESS:  Yes. | 14:21:39 |
| 15 | BY MS. TUTUNDJIAN: | 14:21:41 |
| 16 | Q    Any additional certifications that are not | 14:21:43 |
| 17 | otherwise listed here? | 14:21:44 |
| 18 | A    No. | 14:21:53 |
| 19 | Q    So looking at the first one, certified as | 14:21:56 |
| 20 | an Information Systems Auditor, CISA, Information | 14:21:58 |
| 21 | Systems Audit and Control Association, 2002. | 14:22:03 |
| 22 | What does this refer to? | 14:22:06 |
| 23 | MR. COELHO:  Objection.  Compound.  You | 14:22:10 |
| 24 | can answer. | 14:22:13 |
| 25 | THE WITNESS:  Would you repeat that last | 14:22:14 |

Page 69

| | | |
|---|---|---|
| 1 | part?  Because I didn't hear you. | 14:22:15 |
| 2 | BY MS. TUTUNDJIAN: | 14:22:16 |
| 3 | Q    Oh, yeah.  I'm just looking at your first | 14:22:17 |
| 4 | certification which is the CISA one.  My question is | 14:22:19 |
| 5 | what does this refer to? | 14:22:23 |
| 6 | MR. COELHO:  Objection.  Document speaks | 14:22:25 |
| 7 | for itself.  You can answer. | 14:22:26 |
| 8 | THE WITNESS:  The CISA is a Certified | 14:22:28 |
| 9 | Information Systems Auditor.  It's a | 14:22:30 |
| 10 | certification in the area of information | 14:22:39 |
| 11 | systems auditing.  How to do it. | 14:22:43 |
| 12 | BY MS. TUTUNDJIAN: | 14:22:54 |
| 13 | Q    It's not related to web accessibility? | 14:22:54 |
| 14 | MR. COELHO:  Objection.  Vague.  Calls for | 14:22:57 |
| 15 | a legal conclusion. | 14:22:59 |
| 16 | THE WITNESS:  It has to do with auditing | 14:23:06 |
| 17 | IT systems, which a website would be an IT | 14:23:07 |
| 18 | system.  So in that sense, yes, it's directly | 14:23:10 |
| 19 | relevant. | 14:23:16 |
| 20 | BY MS. TUTUNDJIAN: | 14:23:16 |
| 21 | Q    So what did you do to obtain this | 14:23:17 |
| 22 | certification? | 14:23:19 |
| 23 | A    I'm sorry? | 14:23:20 |
| 24 | Q    What did you do in order to obtain this | 14:23:21 |
| 25 | certification? | 14:23:23 |

Page 70

| | | |
|---|---|---|
| 1 | MR. COELHO:  Objection.  Vague.  You can | 14:23:25 |
| 2 | answer. | 14:23:26 |
| 3 | THE WITNESS:  At the time in which I | 14:23:30 |
| 4 | obtained this certification I believe it | 14:23:32 |
| 5 | required, I want to say, five years -- five | 14:23:35 |
| 6 | years of actual experience performing IT | 14:23:45 |
| 7 | audits.  There was also a bluebook exam that I | 14:23:47 |
| 8 | believe went four hours with a minimum passing | 14:23:56 |
| 9 | score. | 14:24:00 |
| 10 | There is also a continuing education | 14:24:02 |
| 11 | requirement of -- I want to say it's a minimum | 14:24:08 |
| 12 | of 20 hours a year and a hundred hours every | 14:24:14 |
| 13 | three years, so the math doesn't add up, it | 14:24:23 |
| 14 | never has, but it's a hundred hours every three | 14:24:26 |
| 15 | years with 20 a year as a minimum.  And I | 14:24:28 |
| 16 | maintained that since 2002. | 14:24:39 |
| 17 | BY MS. TUTUNDJIAN: | 14:24:41 |
| 18 | Q   So what aspect of this training relates | 14:24:41 |
| 19 | specifically to web accessibility issues? | 14:24:43 |
| 20 | A   Understanding the development of a | 14:24:54 |
| 21 | methodology for testing IT systems, pretty much this | 14:24:55 |
| 22 | would be the process -- this would be what I've | 14:25:04 |
| 23 | relied on as my training and understanding for | 14:25:14 |
| 24 | developing a process that I follow and the | 14:25:17 |
| 25 | components that was used. | 14:25:19 |

Page 71

| | | |
|---|---|---|
| 1 | You know, it taught me to be an IT auditor | 14:25:21 |
| 2 | and then there I applied it to this specific problem | 14:25:26 |
| 3 | which is auditing websites for compliance. | 14:25:30 |
| 4 | Q    How did you apply it?  How did you apply | 14:25:36 |
| 5 | your IT training to auditing websites for website | 14:25:38 |
| 6 | accessibility? | 14:25:43 |
| 7 | A    Well, the process of becoming a CISA | 14:26:00 |
| 8 | requires you to understand the environment that | 14:26:06 |
| 9 | you're testing, understanding the components within | 14:26:08 |
| 10 | the environment that you're testing, identifying | 14:26:11 |
| 11 | what can be tested, identifying the standards that | 14:26:15 |
| 12 | you're going to be measured against. | 14:26:19 |
| 13 | These are all things in which I would have | 14:26:20 |
| 14 | learned and mastered while obtaining my CISA.  And | 14:26:24 |
| 15 | then begin to apply throughout the five years prior | 14:26:28 |
| 16 | to becoming a CISA as well as since then. | 14:26:31 |
| 17 | Those same elements are applicable when | 14:26:36 |
| 18 | developing an audit model for websites.  Because I | 14:26:39 |
| 19 | need to understand what the website is, I need to | 14:26:42 |
| 20 | understand what exactly I'm testing for, I need to | 14:26:49 |
| 21 | find a standard that I'm testing against.  Then | 14:26:52 |
| 22 | developing the process for actually testing it and | 14:26:54 |
| 23 | then making a determination as to which components | 14:26:57 |
| 24 | are compliant and not. | 14:26:59 |
| 25 | So it's directly related. | 14:27:01 |

Page  72

| | | |
|---|---|---|
| 1 | Q    Okay.  And earlier you testified that you | 14:27:04 |
| 2 | did not audit a website for web accessibility until | 14:27:06 |
| 3 | about 2017 or 2018? | 14:27:11 |
| 4 | A    That's correct.  That's the first time I | 14:27:14 |
| 5 | was involved in the industry.  That's correct. | 14:27:16 |
| 6 | Q    So your CISA training would not have | 14:27:21 |
| 7 | overlap of web accessibility until 2017 or 2018? | 14:27:25 |
| 8 | MR. COELHO:  Objection.  Misstates prior | 14:27:31 |
| 9 | testimony.  You can answer. | 14:27:32 |
| 10 | THE WITNESS:  I don't think website | 14:27:38 |
| 11 | accessibility was an issue in 2002.  So you're | 14:27:38 |
| 12 | absolutely right.  I became involved in the | 14:27:43 |
| 13 | issues of website accessibility in 2017 and | 14:27:50 |
| 14 | that's when I took the skills which at that | 14:27:53 |
| 15 | point I would have had 15 years -- another 5 -- | 14:27:57 |
| 16 | almost 20 years of auditing websites.  And I | 14:28:01 |
| 17 | applied that 20 years' experience to the issue | 14:28:05 |
| 18 | of website compliance. | 14:28:11 |
| 19 | BY MS. TUTUNDJIAN: | 14:28:13 |
| 20 | Q    And your CISA certification, not related to | 14:28:14 |
| 21 | ADA training? | 14:28:19 |
| 22 | MR. COELHO:  Objection.  Vague.  Calls for | 14:28:22 |
| 23 | a legal conclusion.  You can answer. | 14:28:24 |
| 24 | THE WITNESS:  I don't understand your | 14:28:29 |
| 25 | question.  Would you repeat it, please? | 14:28:29 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | BY MS. TUTUNDJIAN: | 14:28:31 |
| 2 | Q    Sure.  In obtaining your certification for | 14:28:31 |
| 3 | CISA, was there any ADA training involved? | 14:28:38 |
| 4 | A    No. | 14:28:41 |
| 5 | Q    And was there any ADA compliance for | 14:28:42 |
| 6 | website training involved? | 14:28:45 |
| 7 | A    No. | 14:28:49 |
| 8 | Q    Your next certification is the CISM, | 14:28:50 |
| 9 | certified as an Information Security Manager, which | 14:28:56 |
| 10 | you obtained in 2003? | 14:28:58 |
| 11 | A    Yes, ma'am. | 14:29:04 |
| 12 | Q    And what does this refer to? | 14:29:04 |
| 13 | A    This is a certification in the area of | 14:29:07 |
| 14 | information security management.  Both, say, from | 14:29:11 |
| 15 | the ground up for information security, | 14:29:19 |
| 16 | understanding how security is applied in both a | 14:29:24 |
| 17 | physical and virtual environment.  Virtual being | 14:29:34 |
| 18 | internet.  Okay?  Physical being the IT structures | 14:29:39 |
| 19 | where there's cables and wires running. | 14:29:42 |
| 20 | So that certification has to do with that, | 14:29:47 |
| 21 | very -- very similar to the CISA, but applicable to | 14:29:54 |
| 22 | the area of information secured. | 14:30:02 |
| 23 | Q    And this -- the training involved in | 14:30:05 |
| 24 | obtaining the certification was not related to web | 14:30:07 |
| 25 | accessibility? | 14:30:14 |

Page 74

| | | | |
|---|---|---|---|
| 1 | A | No. | 14:30:15 |
| 2 | Q | And it wasn't related to ADA training? | 14:30:16 |
| 3 | A | No. | 14:30:20 |
| 4 | Q | And it wasn't related to ADA compliance for | 14:30:20 |
| 5 | | websites? | 14:30:23 |
| 6 | A | No. | 14:30:24 |
| 7 | Q | Next one, Certified in Computer Forensics, | 14:30:26 |
| 8 | | 2003.  Did this one relate to web accessibility? | 14:30:29 |
| 9 | A | No. | 14:30:34 |
| 10 | Q | How about ADA training? | 14:30:34 |
| 11 | A | No. | 14:30:37 |
| 12 | Q | ADA compliance for websites? | 14:30:39 |
| 13 | A | No.  It wasn't part of the training. | 14:30:43 |
| 14 | Q | Okay.  Next one, Certified as an Access | 14:30:46 |
| 15 | | Data Certified Examiner, 2009 and 2015. | 14:30:48 |
| 16 | | Does this relate to web accessibility? | 14:30:54 |
| 17 | A | No. | 14:30:57 |
| 18 | Q | How about ADA training? | 14:30:57 |
| 19 | A | No. | 14:30:59 |
| 20 | Q | ADA compliance for websites? | 14:31:00 |
| 21 | A | No. | 14:31:02 |
| 22 | Q | Next one, Certified in Blockchain | 14:31:04 |
| 23 | | Essentials, 2021.  Does this certification relate to | 14:31:07 |
| 24 | | web accessibility? | 14:31:12 |
| 25 | A | No. | 14:31:13 |

Page 75

| | | |
|---|---|---|
| 1 | Q     How about ADA training? | 14:31:14 |
| 2 | A     No. | 14:31:16 |
| 3 | Q     How about ADA compliance for websites? | 14:31:17 |
| 4 | A     No. | 14:31:19 |
| 5 | Q     And the last one, Forensic Explorer | 14:31:20 |
| 6 | Certified Examiner, 2021.  Does this relate to web | 14:31:23 |
| 7 | accessibility? | 14:31:28 |
| 8 | A     No. | 14:31:30 |
| 9 | Q     How about ADA training? | 14:31:31 |
| 10 | A     No. | 14:31:32 |
| 11 | Q     How about ADA compliance for websites? | 14:31:33 |
| 12 | A     No. | 14:31:36 |
| 13 | Q     Mr. Moody, are you familiar with the | 14:31:38 |
| 14 | Certified Professional in Web Accessibility, CPWA? | 14:31:41 |
| 15 | MR. COELHO:  Objection.  Vague.  You can | 14:31:47 |
| 16 | answer. | 14:31:49 |
| 17 | THE WITNESS:  I am. | 14:32:00 |
| 18 | BY MS. TUTUNDJIAN: | 14:32:01 |
| 19 | Q     What does that refer to? | 14:32:01 |
| 20 | A     It has to do with a certification | 14:32:03 |
| 21 | specifically relating to -- the last time I looked | 14:32:04 |
| 22 | at the certification, multiple parts.  It was -- | 14:32:12 |
| 23 | eventually works into you complete the training, you | 14:32:17 |
| 24 | take a test, you pass the test, and you obtain the | 14:32:20 |
| 25 | certification. | 14:32:22 |

Page 76

| | | |
|---|---|---|
| 1 | Q    In web accessibility, right? | 14:32:25 |
| 2 | A    That's correct. | 14:32:29 |
| 3 | Q    And these certifications are unmatched in | 14:32:34 |
| 4 | terms of industry recognition; is that right? | 14:32:36 |
| 5 | MR. COELHO:  Objection. | 14:32:40 |
| 6 | THE WITNESS:  I'm sorry. | 14:32:43 |
| 7 | MR. COELHO:  You can answer. | 14:32:44 |
| 8 | BY MS. TUTUNDJIAN: | 14:32:44 |
| 9 | Q    CPWA certification is unmatched in terms of | 14:32:44 |
| 10 | industry recognition in terms of web accessibility | 14:32:50 |
| 11 | certifications? | 14:32:55 |
| 12 | MR. COELHO:  Objection.  Misstates prior | 14:32:56 |
| 13 | testimony.  Calls for speculation as to | 14:32:58 |
| 14 | "unmatched."  You can answer. | 14:32:59 |
| 15 | THE WITNESS:  I believe the certification | 14:33:04 |
| 16 | is one of very few that exist within the | 14:33:05 |
| 17 | industry.  So I'm not sure how to classify it | 14:33:08 |
| 18 | as unmatched as I don't think that there's a | 14:33:13 |
| 19 | whole lot out there to compare it to.  But I -- | 14:33:15 |
| 20 | yeah.  The entire -- yeah.  It's a good | 14:33:24 |
| 21 | certification.  Something to work towards. | 14:33:32 |
| 22 | BY MS. TUTUNDJIAN: | 14:33:37 |
| 23 | Q    What are the other certifications in the | 14:33:37 |
| 24 | industry that you refer to? | 14:33:41 |
| 25 | A    Off the top of my head, I can't recall the | 14:33:45 |

Page 77

| | | | |
|---|---|---|---|
| 1 | | acronyms. | 14:33:46 |
| 2 | Q | How many are there? | 14:33:49 |
| 3 | A | I'm sorry? | 14:33:50 |
| 4 | Q | How many are there? | 14:33:50 |
| 5 | A | A couple other ones, I believe. | 14:33:56 |
| 6 | Q | And are you CPWA certified? | 14:34:00 |
| 7 | A | Not at the present time. | 14:34:04 |
| 8 | Q | Have you ever been CPWA certified? | 14:34:06 |
| 9 | A | No, I have not. | 14:34:14 |
| 10 | Q | And so you didn't pass the Certified | 14:34:15 |
| 11 | | Professional and Accessibility core competency exam? | 14:34:17 |
| 12 | | MR. COELHO:  Objection.  Misstates prior | 14:34:22 |
| 13 | | testimony.  You can answer. | 14:34:24 |
| 14 | | THE WITNESS:  I haven't taken that | 14:34:27 |
| 15 | | certification test. | 14:34:29 |
| 16 | | BY MS. TUTUNDJIAN: | 14:34:32 |
| 17 | Q | And what about the Web Accessibility | 14:34:32 |
| 18 | | Specialist exam, have you taken that exam? | 14:34:36 |
| 19 | A | I haven't taken any of the certification | 14:34:38 |
| 20 | | exams.  I have been taking the coursework, again, as | 14:34:41 |
| 21 | | part of the certification process -- or the | 14:34:48 |
| 22 | | continuing education credit process.  But there's | 14:34:53 |
| 23 | | 160 hours a week and most of my hours are full.  So | 14:34:59 |
| 24 | | I don't get the school time as one would like. | 14:35:03 |
| 25 | Q | So you do not have any certifications in | 14:35:11 |

Page 78

| | | |
|---|---|---|
| 1 | web accessibility? | 14:35:13 |
| 2 | A   Not currently. | 14:35:14 |
| 3 | Q   And you never have? | 14:35:17 |
| 4 | A   Not currently. | 14:35:19 |
| 5 | Q   Aside from currently, you've never held | 14:35:25 |
| 6 | them previously as well? | 14:35:28 |
| 7 | A   That's correct. | 14:35:29 |
| 8 | Q   Okay.  Moving on. | 14:35:33 |
| 9 | You have a section on blockchain training | 14:35:46 |
| 10 | on your CV.  I'm going to assume this does not | 14:35:48 |
| 11 | relate to web accessibility? | 14:35:51 |
| 12 | MR. COELHO:  Objection.  Vague. | 14:35:54 |
| 13 | THE WITNESS:  It does not. | 14:35:55 |
| 14 | MR. COELHO:  You can answer. | 14:35:57 |
| 15 | THE WITNESS:  It does not. | 14:35:58 |
| 16 | BY MS. TUTUNDJIAN: | 14:35:58 |
| 17 | Q   So the next section we have is on ADA/Web | 14:35:59 |
| 18 | Accessibility Training.  Is this the complete and | 14:36:04 |
| 19 | accurate list of all of your ADA/web accessibility | 14:36:08 |
| 20 | training? | 14:36:14 |
| 21 | A   No.  It appears there are some courses from | 14:36:15 |
| 22 | 2023 that did not make this copy. | 14:36:19 |
| 23 | Q   Okay.  What are the courses? | 14:36:22 |
| 24 | A   I'm sorry? | 14:36:25 |
| 25 | Q   What are the courses? | 14:36:27 |

Page 79

| | | | |
|---|---|---|---|
| 1 | A | I don't need to go off the record, but can | 14:36:33 |
| 2 | I look at something to give you that information? | | 14:36:34 |
| 3 | Q | Let's just revisit after the lunch break. | 14:36:39 |
| 4 | A | I'm sorry? | 14:36:43 |
| 5 | Q | We can just revisit that after the lunch | 14:36:44 |
| 6 | break when you've had an opportunity to review your | | 14:36:46 |
| 7 | notes. | | 14:36:48 |
| 8 | A | Okay. | 14:36:49 |
| 9 | Q | Okay.  So the first one, Web Accessibility, | 14:36:52 |
| 10 | Learn the Best Practice, Tools, and Techniques. | | 14:37:00 |
| 11 | What was the nature of this training? | | 14:37:01 |
| 12 | A | It was an introduction to web accessibility | 14:37:11 |
| 13 | to provide a foundation for people.  It's sort of | | 14:37:17 |
| 14 | Web Accessibility 101, provided a background and an | | 14:37:23 |
| 15 | understanding for people that were looking to bring | | 14:37:26 |
| 16 | their websites into compliance. | | 14:37:30 |
| 17 | Q | And where did the training take place?  Was | 14:37:34 |
| 18 | it online or was it in person? | | 14:37:39 |
| 19 | A | It was online.  All of the training was | 14:37:41 |
| 20 | online. | | 14:37:47 |
| 21 | Q | I'm sorry? | 14:37:48 |
| 22 | A | All of the training was online. | 14:37:49 |
| 23 | Q | Who was the training hosted by? | 14:37:53 |
| 24 | A | I believe that one was Udemy and I don't | 14:37:56 |
| 25 | recall the professor. | | 14:37:58 |

Page 80

| | | |
|---|---|---|
| 1 | Q     Is Udemy accredited? | 14:38:01 |
| 2 | MR. COELHO:  Objection.  Vague.  You can | 14:38:03 |
| 3 | answer. | 14:38:05 |
| 4 | THE WITNESS:  I don't understand the | 14:38:08 |
| 5 | question.  Accredited by whom?  Or is that the | 14:38:09 |
| 6 | question? | 14:38:16 |
| 7 | BY MS. TUTUNDJIAN: | 14:38:17 |
| 8 | Q     Yeah, if it's accredited.  I mean, there | 14:38:17 |
| 9 | are educational programs, university, schools that | 14:38:19 |
| 10 | are accredited.  Is this program accredited or is it | 14:38:22 |
| 11 | an unaccredited program? | 14:38:25 |
| 12 | A     I have no idea. | 14:38:33 |
| 13 | Q     When was the training? | 14:38:37 |
| 14 | A     I will be able to tell you after the break. | 14:38:42 |
| 15 | Okay? | 14:38:44 |
| 16 | Q     And what did you do for the training? | 14:38:48 |
| 17 | A     I completed the course online and there was | 14:38:58 |
| 18 | no test per se, but just worked through the examples | 14:39:08 |
| 19 | and completed the online class. | 14:39:11 |
| 20 | Q     So it was watching videos? | 14:39:13 |
| 21 | A     Pretty much, yeah.  Yes. | 14:39:16 |
| 22 | Q     How long was the course? | 14:39:20 |
| 23 | A     I don't recall. | 14:39:27 |
| 24 | Q     Five hours, ten hours, fifty hours? | 14:39:28 |
| 25 | A     Yeah.  No.  It wasn't 50 hours, but I don't | 14:39:32 |

Page 81

```
 1      recall.  It was most likely an hour or two, but I      14:39:34
 2      don't recall.                                          14:39:40
 3          Q      Were there any training materials?          14:39:44
 4              MR. COELHO:  Objection.  Vague.  You can       14:39:47
 5          answer.                                            14:39:49
 6              THE WITNESS:  I believe there were, but --     14:39:56
 7          yeah.  I believe there were, but I -- at this      14:39:58
 8          point I would not have kept them.                 14:40:02
 9      BY MS. TUTUNDJIAN:                                     14:40:04
10          Q      Okay.  Did you take any notes during the    14:40:06
11      training?                                              14:40:08
12          A      Yeah.  But once again, I wouldn't know what 14:40:14
13      I've done with them.                                   14:40:24
14          Q      And do you have a certificate of            14:40:28
15      completion?                                            14:40:30
16          A      I'm sorry?                                  14:40:30
17          Q      Do you have a certificate of completion?    14:40:30
18          A      I'm sure there was one, but I don't know    14:40:33
19      where it is.                                           14:40:34
20          Q      Next one we have, Web Accessibility         14:40:39
21      Training, Selenium, BDD, AXE, Pally, JAWS, NVDA.       14:40:43
22              MR. COELHO:  Objection.  Misstates the         14:41:01
23          document.                                          14:41:03
24              MS. TUTUNDJIAN:  What am I misstating?          14:41:03
25              MR. COELHO:  S-t.                              14:41:06
```

Page 82

```
1              MS. TUTUNDJIAN:   Huh?                    14:41:07

2              MR. COELHO:   S-t.   Web testing, yeah.    14:41:07

3              MS. TUTUNDJIAN:   It's web accessibility   14:41:07

4        testing.                                         14:41:14

5              MR. COELHO:   You said training.   That's  14:41:15

6        why I said that.                                 14:41:16

7     BY MS. TUTUNDJIAN:                                  14:41:16

8        Q     Oh, okay.   So to be clear, it says, Web   14:41:16

9     Accessibility Testing-Selenium, BDD, AXE, Pally,   14:41:19

10    JAWS, NVDA; is that correct?                        14:41:27

11             Sorry, Mr. Moody.   Did I read that        14:41:31

12    correctly?                                          14:41:32

13       A     You did.                                   14:41:33

14       Q     Okay.   What was the nature of this        14:41:34

15    training?                                           14:41:38

16       A     It was the introduction to accessibility  14:41:38

17    tools.                                              14:41:43

18       Q     Kind of like the one we just talked about, 14:41:50

19    web accessibility?                                  14:41:52

20       A     More about with JAWS, I'm sure you know is 14:41:53

21    a screen reader, NVDA is a screen reader.   It's    14:41:56

22    about the introduction to different products that   14:42:00

23    would be used within the space to help better access 14:42:05

24    for disabled people.                                14:42:12

25       Q     And where did the training take place,     14:42:20
```

Page 83

| | | | |
|---|---|---|---|
| 1 | | online or in person? | 14:42:22 |
| 2 | A | Online. | 14:42:23 |
| 3 | Q | Do you know who hosted the training? | 14:42:24 |
| 4 | A | I do not know the professor.  I don't | 14:42:29 |
| 5 | | recall.  I didn't record that information.  I | 14:42:32 |
| 6 | | believe all of the training on this list -- most of | 14:42:34 |
| 7 | | them would have been through Udemy.  Some of them | 14:42:41 |
| 8 | | would have been through some of the NGOs, which I | 14:42:44 |
| 9 | | can get you the name of.  But it would have been | 14:42:54 |
| 10 | | either an ADA NGO or it would have been found on | 14:43:07 |
| 11 | | Udemy. | 14:43:13 |
| 12 | Q | You just don't know one way or the other? | 14:43:15 |
| 13 | A | Yeah, I don't recall.  It's been a while. | 14:43:20 |
| 14 | Q | When was this training? | 14:43:28 |
| 15 | A | I will let you know after the break. | 14:43:30 |
| 16 | Q | And what did you do for the training? | 14:43:32 |
| 17 | A | I attended -- watched the videos and | 14:43:36 |
| 18 | | followed along and downloaded a copy of JAWS and | 14:43:44 |
| 19 | | used the software.  There's demo versions. | 14:43:52 |
| 20 | Q | And how long was the training? | 14:44:00 |
| 21 | A | A few hours. | 14:44:03 |
| 22 | Q | More or less than five hours? | 14:44:09 |
| 23 | A | Yeah, I don't recall. | 14:44:19 |
| 24 | Q | Any training materials? | 14:44:20 |
| 25 | A | I'm sure there was, but I would not have | 14:44:21 |

Page 84

| | | |
|---|---|---|
| 1 | retained that. | 14:44:23 |
| 2 | Q    Same for notes? | 14:44:24 |
| 3 | A    That's correct. | 14:44:26 |
| 4 | Q    Next, Responsive Web and Mobile Development | 14:44:34 |
| 5 | in HTML, CSS, and JavaScript. | 14:44:36 |
| 6 |      What was the nature of this training? | 14:44:43 |
| 7 | A    This addressed specific issues within the | 14:44:49 |
| 8 | programming languages of HTML, CSS, and JavaScript. | 14:44:53 |
| 9 | So this was addressing specific concerns that one | 14:45:00 |
| 10 | might run into when providing a website or a mobile | 14:45:06 |
| 11 | app or a mobile website and the issues one would run | 14:45:13 |
| 12 | into. | 14:45:24 |
| 13 | Q    And was this also online? | 14:45:25 |
| 14 | A    Yes. | 14:45:27 |
| 15 | Q    Okay.  And what did you have to do for the | 14:45:28 |
| 16 | training? | 14:45:37 |
| 17 | A    Again, more videos, reviewing some codec | 14:45:38 |
| 18 | that showed specific problems, they would | 14:45:42 |
| 19 | demonstrate a problem and show what the code looked | 14:45:45 |
| 20 | like.  Things of that nature. | 14:45:47 |
| 21 | Q    And how long was the training? | 14:45:52 |
| 22 | A    All of these are just a few hours, you | 14:45:55 |
| 23 | know.  I don't recall specifically. | 14:45:59 |
| 24 | Q    Is it something you did just sitting now, | 14:46:08 |
| 25 | once and one seating? | 14:46:09 |

Page 85

| | | |
|---|---|---|
| 1 | A     I think this one I actually took a | 14:46:11 |
| 2 | couple -- a couple trips.  But I don't know if it | 14:46:14 |
| 3 | was the complex nature and I needed a break or | 14:46:18 |
| 4 | whatever.  But this one I recall was a little more | 14:46:22 |
| 5 | intense. | 14:46:27 |
| 6 | Q     Okay.  So all the training that we have | 14:46:28 |
| 7 | listed here more or less, just to streamline it, was | 14:46:30 |
| 8 | everything here online? | 14:46:35 |
| 9 | A     Yes. | 14:46:36 |
| 10 | Q     Okay.  And it was -- the nature of the | 14:46:37 |
| 11 | training was watching videos? | 14:46:43 |
| 12 | MR. COELHO:  Objection.  Misstates | 14:46:45 |
| 13 | testimony.  You can answer. | 14:46:47 |
| 14 | THE WITNESS:  Watching videos, working | 14:46:49 |
| 15 | through the exercise, problem solving. | 14:46:50 |
| 16 | BY MS. TUTUNDJIAN: | 14:46:54 |
| 17 | Q     Any tests that were required in order to | 14:46:55 |
| 18 | complete the trainings? | 14:46:58 |
| 19 | A     Not for these. | 14:46:59 |
| 20 | Q     Any other ones that did require tests in | 14:47:01 |
| 21 | the ADA web accessibility training? | 14:47:06 |
| 22 | A     Yes.  Actually, the training I've done in | 14:47:13 |
| 23 | 2023 did require -- there was testing and it's | 14:47:15 |
| 24 | actually working towards one of the certifications. | 14:47:22 |
| 25 | So ... but this earlier training is from, I want to | 14:47:26 |

Page 86

| | | |
|---|---|---|
| 1 | say, 2019, but I'll confirm that.  We'll just say | 14:47:32 |
| 2 | that the accessibility training was kind of in its | 14:47:38 |
| 3 | infancy.  So take what you get. | 14:47:42 |
| 4 |     Q    Okay.  So just to streamline our process so | 14:47:47 |
| 5 | we don't have to go through every single one, to | 14:47:49 |
| 6 | summarize the ADA web accessibility training that | 14:47:54 |
| 7 | you have listed here in your CV, not the ones that | 14:47:59 |
| 8 | we're going to talk about later, the 2023 ones, | 14:48:02 |
| 9 | these were all completed online? | 14:48:05 |
| 10 |     A    That's correct. | 14:48:10 |
| 11 |     Q    And as part of the training you watched | 14:48:12 |
| 12 | videos and went through exercises? | 14:48:17 |
| 13 |     A    They were online classroom.  So watched | 14:48:24 |
| 14 | videos, complete exercises, problem solve based upon | 14:48:29 |
| 15 | however the instructor would have created this. | 14:48:35 |
| 16 | Some of them would have been designed to introduce a | 14:48:39 |
| 17 | topic such as introduction to screen readers.  But | 14:48:43 |
| 18 | yeah.  The format was very similar across all of | 14:48:48 |
| 19 | these. | 14:48:51 |
| 20 |     Q    And no testing was required for any of | 14:48:53 |
| 21 | these? | 14:48:56 |
| 22 |     MR. COELHO:  Objection.  Misstates | 14:48:58 |
| 23 | testimony.  You can answer. | 14:48:59 |
| 24 |     THE WITNESS:  Not for these.  I do have | 14:49:01 |
| 25 | the information, if you want it, on the others, | 14:49:08 |

Page 87

| | | |
|---|---|---|
| 1 | though. | 14:49:11 |
| 2 | BY MS. TUTUNDJIAN: | 14:49:11 |
| 3 | Q    We'll get there.   Thank you. | 14:49:12 |
| 4 | And each of these trainings were in the | 14:49:14 |
| 5 | range of, is it fair to say, two to five hours each? | 14:49:18 |
| 6 | A    Yes.   Some would have been longer.   But not | 14:49:26 |
| 7 | substantially longer.   So a day would be the most. | 14:49:31 |
| 8 | Q    Okay.   And you don't know whether or not | 14:49:36 |
| 9 | whoever hosted the training was accredited? | 14:49:43 |
| 10 | MR. COELHO:   Objection.   Misstates prior | 14:49:47 |
| 11 | testimony.   You can answer.   Sorry.   Vague. | 14:49:48 |
| 12 | You can answer. | 14:49:53 |
| 13 | THE WITNESS:   I don't know which of these | 14:49:54 |
| 14 | would have been accredited. | 14:50:00 |
| 15 | BY MS. TUTUNDJIAN: | 14:50:01 |
| 16 | Q    So the 2023 ones, I will take those if you | 14:50:02 |
| 17 | have them for me. | 14:50:04 |
| 18 | A    Great.   And just because I said I would | 14:50:06 |
| 19 | tell you, the first four items on the list going | 14:50:13 |
| 20 | from web accessibility to creating accessible | 14:50:16 |
| 21 | websites were done in 2019. | 14:50:20 |
| 22 | Q    Okay. | 14:50:24 |
| 23 | A    HTML down to iOS native mobility | 14:50:25 |
| 24 | accessibility were completed in 2020.   In 2023 I | 14:50:32 |
| 25 | completed work in the area of customer service for | 14:50:43 |

Page 88

| | | |
|---|---|---|
| 1 | people with disabilities, which included a separate | 14:50:47 |
| 2 | section on serving customers with disability, | 14:50:56 |
| 3 | disability etiquette basics and effective | 14:51:00 |
| 4 | communications, and there were two parts.  So | 14:51:04 |
| 5 | that -- so those four or five components were done | 14:51:09 |
| 6 | there. | 14:51:14 |
| 7 | Additionally, an additional one was done | 14:51:15 |
| 8 | in, as they described it, angular accessibility | 14:51:20 |
| 9 | issues framework and testing.  So methodology for | 14:51:24 |
| 10 | completing web accessibility testing.  And that was | 14:51:29 |
| 11 | in 2023 as well. | 14:51:40 |
| 12 | Q    So which is the one that required a test? | 14:51:48 |
| 13 | A    Yes. | 14:51:51 |
| 14 | Q    Sorry.  Which one? | 14:51:52 |
| 15 | A    All five of the ones I mentioned required | 14:51:53 |
| 16 | tests. | 14:52:01 |
| 17 | Q    Okay.  And did you pass those tests? | 14:52:02 |
| 18 | A    Yeah.  Hundred percent on each test. | 14:52:04 |
| 19 | Q    But you have not gotten a certification | 14:52:09 |
| 20 | yet? | 14:52:11 |
| 21 | MR. COELHO:  Objection.  Vague.  You can | 14:52:13 |
| 22 | answer. | 14:52:14 |
| 23 | THE WITNESS:  I have not taken -- | 14:52:16 |
| 24 | MR. COELHO:  Also misstates testimony. | 14:52:17 |
| 25 | You can answer. | 14:52:19 |

Page 89

| | | |
|---|---|---|
| 1 | THE WITNESS:  I have not taken a | 14:52:21 |
| 2 | certification exam yet.  I'm not ready yet. | 14:52:23 |
| 3 | BY MS. TUTUNDJIAN: | 14:52:30 |
| 4 | Q    Okay.  So moving on to expert witness | 14:52:31 |
| 5 | experience.  Assuming my math is right, you have | 14:52:42 |
| 6 | identified 25 cases for which you provided expert | 14:52:48 |
| 7 | witness work; is that right? | 14:52:52 |
| 8 | A    I believe that's correct.  That would fall | 14:53:03 |
| 9 | within the last -- there's more, but they're older | 14:53:05 |
| 10 | cases so they're not part of this. | 14:53:12 |
| 11 | Q    Okay. | 14:53:15 |
| 12 | A    And some of these might be of an age that | 14:53:15 |
| 13 | they need to start coming off the bottom.  Okay? | 14:53:18 |
| 14 | Q    Is this a complete and accurate list of the | 14:53:26 |
| 15 | relevant experience that you wanted to include in | 14:53:32 |
| 16 | your CV at least? | 14:53:36 |
| 17 | A    I have two -- two cases that -- other than | 14:53:44 |
| 18 | this deposition I have two other cases which I | 14:53:49 |
| 19 | testified in since issuing my report.  So with the | 14:53:51 |
| 20 | addition of those two, I think that this would be | 14:54:00 |
| 21 | representative of my recent testimony. | 14:54:05 |
| 22 | Q    And what are those two cases? | 14:54:11 |
| 23 | A    I'm sorry? | 14:54:13 |
| 24 | Q    What are those two cases? | 14:54:14 |
| 25 | A    One of them is in re Marjorie Shepherd in | 14:54:17 |

Page 90

| | | |
|---|---|---|
| 1 | the 11th Circuit Court of the Judicial Circuit Court | 14:54:25 |
| 2 | of Miami, Dade County.   It's a state case.   Would | 14:54:30 |
| 3 | you like the case number? | 14:54:35 |
| 4 | Q    Yes, please. | 14:54:36 |
| 5 | A    2022-000118-CP-02. | 14:54:37 |
| 6 | Q    What does this case relate to? | 14:54:54 |
| 7 | A    I testified regarding the imaging of an | 14:54:56 |
| 8 | iPhone and verification of the data found on it. | 14:54:58 |
| 9 | Q    And the second case? | 14:55:04 |
| 10 | A    State of Florida versus Carlos Mendez. | 14:55:06 |
| 11 | Also the 11th Judicial Circuit for Miami, Dade. | 14:55:11 |
| 12 | Case No. F23-005216. | 14:55:15 |
| 13 | Q    And what is the nature of this case? | 14:55:27 |
| 14 | A    I testified to the status of a cellular | 14:55:31 |
| 15 | phone power base upon records kept on the carrier | 14:55:35 |
| 16 | and data found on the phone itself.  So this had to | 14:55:38 |
| 17 | do with what records would be available if -- I | 14:55:42 |
| 18 | think if they were to have requested them from the | 14:55:50 |
| 19 | carrier. | 14:55:53 |
| 20 | Q    Thank you for that. | 14:55:54 |
| 21 | Any other additions that you'd like to | 14:55:57 |
| 22 | make? | 14:55:59 |
| 23 | A    I'm looking at the document and I think | 14:56:00 |
| 24 | that everything else is on it.   I think the two I | 14:56:05 |
| 25 | gave you plus what was attached to my report would | 14:56:10 |

Page 91

```
 1     be my testifying -- my recent testifying history.        14:56:15
 2         Q    So none of these expert experiences relate      14:56:23
 3     to web accessibility; is that right?                     14:56:26
 4         A    That is correct.                                14:56:31
 5         Q    And none of these expert experiences relate     14:56:31
 6     to ADA compliance; is that right?                        14:56:33
 7         A    That is correct.                                14:56:35
 8         Q    Have you ever testified regarding the           14:56:37
 9     issues in this case?                                     14:56:39
10         A    No.                                             14:56:46
11         Q    Have your opinions or testimony ever been       14:56:46
12     excluded from a case?                                    14:56:48
13         A    No.                                             14:56:51
14         Q    Have they ever been admitted in a case?         14:57:00
15         A    I'm sorry?                                       14:57:02
16         Q    Have your opinions or testimony ever been       14:57:03
17     admitted in a case?                                      14:57:05
18         A    Yes.                                            14:57:06
19         Q    Which ones?                                     14:57:07
20         A    All of them.                                    14:57:08
21         Q    But none of them related to web                 14:57:16
22     accessibility?                                           14:57:18
23         A    Right.                                          14:57:18
24         Q    And none of them related to ADA compliance?     14:57:19
25         A    I'm sorry?                                       14:57:22
```

Page 92

| | | |
|---|---|---|
| 1 | Q    And none of them related to ADA compliance? | 14:57:23 |
| 2 | A    The ones listed in my testimony, no. | 14:57:25 |
| 3 | Q    Are there any that are not listed in your | 14:57:28 |
| 4 | testimony that do relate to ADA compliance? | 14:57:31 |
| 5 | A    No.   I had never testified on ADA issues | 14:57:39 |
| 6 | before.   This is the first time that anyone has | 14:57:42 |
| 7 | taken my deposition for anything in an ADA-related | 14:57:45 |
| 8 | case. | 14:57:54 |
| 9 | Q    And the same thing for web accessibility? | 14:57:54 |
| 10 | A    Yes.   To me, I grouped it all together. | 14:57:55 |
| 11 | Q    Moving on to Teaching and Lectures by | 14:58:04 |
| 12 | Topic.   Is this a complete and accurate list? | 14:58:06 |
| 13 | A    Yes. | 14:58:13 |
| 14 | Q    Any others? | 14:58:14 |
| 15 | A    I'm sorry? | 14:58:18 |
| 16 | Q    Any others that you'd like to supplement? | 14:58:19 |
| 17 | A    No.   I think that's pretty complete. | 14:58:27 |
| 18 | Q    And none of these teaching and lectures | 14:58:33 |
| 19 | relate to web accessibility; is that right? | 14:58:37 |
| 20 | A    That's correct. | 14:58:40 |
| 21 | Q    And none of these teaching and lectures | 14:58:42 |
| 22 | relate to ADA compliance; is that right? | 14:58:43 |
| 23 | A    That's correct. | 14:58:46 |
| 24 | Q    And finally, publications.   Is this a | 14:58:50 |
| 25 | complete and accurate list? | 14:58:56 |

Page 93

| | | |
|---|---|---|
| 1 | A    Yes. | 14:58:58 |
| 2 | Q    And none of these publications relate to | 14:59:00 |
| 3 | web accessibility; is that right? | 14:59:03 |
| 4 | A    That's correct. | 14:59:05 |
| 5 | Q    And none of these publications relate to | 14:59:05 |
| 6 | ADA compliance; is that right? | 14:59:08 |
| 7 | A    That's correct. | 14:59:10 |
| 8 | Q    Okay.  And perfect timing.  So we can go | 14:59:11 |
| 9 | off the record if that's good with you guys. | 14:59:16 |
| 10 | MR. COELHO:  Let's go off the record. | 14:59:20 |
| 11 | THE VIDEOGRAPHER:  We are off the record. | 14:59:23 |
| 12 | The time is 2:59 p.m. | 14:59:24 |
| 13 | (Off the record.) | 14:59:28 |
| 14 | THE VIDEOGRAPHER:  We are back on the | 15:33:18 |
| 15 | record.  The time is 3:33 p.m. | 15:33:18 |
| 16 | BY MS. TUTUNDJIAN: | 15:33:26 |
| 17 | Q    Welcome back.  So continuing on with your | 15:33:27 |
| 18 | expert report, starting on page 4 with the manual | 15:33:29 |
| 19 | review of Fashion Nova's website, you indicate that | 15:33:34 |
| 20 | Forensic Data Services performed a manual review of | 15:33:41 |
| 21 | Fashion Nova website; is that right? | 15:33:44 |
| 22 | A    One second. | 15:33:45 |
| 23 | MR. COELHO:  What page are you on? | 15:33:53 |
| 24 | BY MS. TUTUNDJIAN: | 15:33:54 |
| 25 | Q    Right now, 4.  I'm going to flip back to 3 | 15:33:55 |

Page 94

| | | |
|---|---|---|
| 1 | website and experiencing barriers is exactly | 16:16:18 |
| 2 | that. | 16:16:23 |
| 3 | The qualifier of significance is really | 16:16:25 |
| 4 | something that you would have to ask the person | 16:16:29 |
| 5 | who was experiencing it.  Is this something | 16:16:31 |
| 6 | they can deal with? | 16:16:35 |
| 7 | I can't speak to that part of it.  I can | 16:16:38 |
| 8 | only speak to the part that the screen reader | 16:16:40 |
| 9 | identified problems with the website.  Those | 16:16:42 |
| 10 | are barriers and those are barriers that would | 16:16:45 |
| 11 | potentially create problems for the disabled | 16:16:48 |
| 12 | users of the website. | 16:16:52 |
| 13 | BY MS. TUTUNDJIAN: | 16:16:53 |
| 14 | Q    Okay.  And do the barriers that you've | 16:16:53 |
| 15 | identified in your report as part of your manual | 16:16:56 |
| 16 | review rise to the level of concluding that Fashion | 16:16:59 |
| 17 | Nova's website is not ADA-complaint? | 16:17:05 |
| 18 | A    I would say yes. | 16:17:08 |
| 19 | Q    Based on what? | 16:17:11 |
| 20 | A    Based on the fact that the barriers that | 16:17:13 |
| 21 | exist did not meet the standards as presented within | 16:17:17 |
| 22 | WCAG and WCAG is the standard that's being applied | 16:17:25 |
| 23 | for website-compliant.  The barriers exist and | 16:17:32 |
| 24 | they're impacting the people visiting the site. | 16:17:37 |
| 25 | Q    Well, to clarify, you have chosen to use | 16:17:39 |

Page 121

| | | |
|---|---|---|
| 1 | WCAG as the guideline for purposes of auditing | 16:17:46 |
| 2 | Fashion Nova's website, right? | 16:17:51 |
| 3 | MR. COELHO:  Objection.  Vague.  You can | 16:17:58 |
| 4 | answer if you understand the question. | 16:17:59 |
| 5 | THE WITNESS:  I am using WCAG as the | 16:18:03 |
| 6 | standard to audit Fashion Nova's website, yes. | 16:18:06 |
| 7 | BY MS. TUTUNDJIAN: | 16:18:08 |
| 8 | Q    And WCAG is not the only standard used to | 16:18:09 |
| 9 | determine whether or not a website is accessible? | 16:18:11 |
| 10 | A    It is the standard that I used in this | 16:18:22 |
| 11 | case. | 16:18:23 |
| 12 | Q    My question is different.  WCAG is not the | 16:18:24 |
| 13 | only standard used to determine whether or not a | 16:18:26 |
| 14 | website is accessible? | 16:18:29 |
| 15 | MR. COELHO:  Objection.  Asked and | 16:18:31 |
| 16 | answered.  You can answer. | 16:18:31 |
| 17 | THE WITNESS:  There are other standards, | 16:18:38 |
| 18 | but they're not usually applied to commercial | 16:18:38 |
| 19 | websites.  Section 508 is applied to the | 16:18:41 |
| 20 | government, WCAG is what's applied to | 16:18:44 |
| 21 | commercial websites.  So this standard is the | 16:18:48 |
| 22 | best standard. | 16:18:51 |
| 23 | BY MS. TUTUNDJIAN: | 16:18:52 |
| 24 | Q    There are other standards that are used to | 16:18:52 |
| 25 | determine whether or not a website is ADA-complaint | 16:18:55 |

Page 122

| | | |
|---|---|---|
| 1 | but you did not use the other standards? | 16:18:59 |
| 2 | MR. COELHO:  Objection.  Asked and | 16:19:02 |
| 3 | answered.  You can answer again. | 16:19:02 |
| 4 | THE WITNESS:  I did not use any other | 16:19:07 |
| 5 | standard except for WCAG. | 16:19:11 |
| 6 | BY MS. TUTUNDJIAN: | 16:19:12 |
| 7 | Q    Okay. | 16:19:13 |
| 8 | A    Because that's the best standard to be | 16:19:17 |
| 9 | applied here. | 16:19:18 |
| 10 | Q    Can you point me to any publications or | 16:19:19 |
| 11 | documents that say WCAG is the best standard to | 16:19:21 |
| 12 | apply? | 16:19:24 |
| 13 | A    No. | 16:19:25 |
| 14 | Q    So that's your personal opinion? | 16:19:29 |
| 15 | A    Yes. | 16:19:30 |
| 16 | Q    And as part of your manual review, you used | 16:19:34 |
| 17 | screen readers, right?  That was your methodology to | 16:19:39 |
| 18 | determine whether or not there were any web | 16:19:42 |
| 19 | accessibility issues? | 16:19:44 |
| 20 | MR. COELHO:  Objection.  Misstates prior | 16:19:47 |
| 21 | testimony.  You can answer. | 16:19:48 |
| 22 | THE WITNESS:  My manual review included | 16:19:53 |
| 23 | the use of screen readers, but it was not the | 16:19:55 |
| 24 | only thing in which I did as part of the manual | 16:19:58 |
| 25 | review. | 16:20:00 |

Page 123

```
 1            MR. COELHO:  Anna, whenever it's possible    17:26:43

 2       for you to take a break.                          17:26:45

 3            MS. TUTUNDJIAN:  Yeah.  As soon as I wrap     17:26:46

 4       this up.                                          17:26:47

 5   BY MS. TUTUNDJIAN:                                    17:26:48

 6       Q    So just so I understand, in your review      17:26:49

 7   of -- I believe you said around 2,000 websites that   17:26:54

 8   you've audited, have you ever come across an          17:26:57

 9   instance where any particular website did not have    17:27:01

10   any accessibility issues?                             17:27:04

11            MR. COELHO:  Objection.  Vague.              17:27:07

12       Incomplete hypothetical.  You can answer.         17:27:09

13            THE WITNESS:  Yes.                           17:27:14

14   BY MS. TUTUNDJIAN:                                    17:27:15

15       Q    Okay.  Which ones?                           17:27:16

16       A    I don't know.  I've never been asked that    17:27:22

17   question before so I don't have a list of the         17:27:25

18   websites that passed in my head.                      17:27:27

19       Q    Sorry.  That passed?                         17:27:32

20       A    Well, that they -- they didn't have issues.  17:27:34

21   So if I'm looking at a pass/fail, my choice of        17:27:40

22   words, I have run across websites that the physical   17:27:44

23   examination and the automated testing showed that    17:27:50

24   there were no issues with the website.  I can't tell  17:27:54

25   you the names of the websites.                        17:27:57
```

Page 159

| | | |
|---|---|---|
| 1 | Q   How many websites? | 17:28:00 |
| 2 | A   Couple dozen. | 17:28:02 |
| 3 | Q   So about 24 websites where your audit | 17:28:04 |
| 4 | revealed there were zero accessibility issues? | 17:28:08 |
| 5 | MR. COELHO:  Objection.  Misstates prior | 17:28:13 |
| 6 | testimony.  You can answer. | 17:28:15 |
| 7 | THE WITNESS:  That's correct. | 17:28:17 |
| 8 | BY MS. TUTUNDJIAN: | 17:28:17 |
| 9 | Q   And how many different tools did you use to | 17:28:18 |
| 10 | run your testing on these websites? | 17:28:22 |
| 11 | MR. COELHO:  Objection.  Vague as to which | 17:28:25 |
| 12 | website.  You can answer. | 17:28:27 |
| 13 | MS. TUTUNDJIAN:  The 24 or so websites | 17:28:29 |
| 14 | that had zero accessibility issues. | 17:28:33 |
| 15 | THE WITNESS:  So the websites that were | 17:28:40 |
| 16 | found not to have the accessibility issues | 17:28:41 |
| 17 | would have followed the same process and | 17:28:44 |
| 18 | methodology that I employed here. | 17:28:47 |
| 19 | BY MS. TUTUNDJIAN: | 17:28:51 |
| 20 | Q   So a manual review and then followed by an | 17:28:51 |
| 21 | automated review using the Deque and WAVE tools? | 17:28:53 |
| 22 | A   Yes. | 17:28:58 |
| 23 | Q   And do you have a way of determining what | 17:29:04 |
| 24 | those 24 websites are? | 17:29:06 |
| 25 | A   In a lot of cases I have non-disclosures in | 17:29:09 |

Page 160

| | | |
|---|---|---|
| 1 | place so I don't keep a lot of records once a case | 17:29:12 |
| 2 | is over.  In fact, I'm kind of mandated not to.  So, | 17:29:16 |
| 3 | no. | 17:29:28 |
| 4 | Q    Okay. | 17:29:28 |
| 5 | A    I am in need of a break. | 17:29:49 |
| 6 | Q    Sorry.  My last two questions here. | 17:29:53 |
| 7 | You also maintain a website for FDS, right? | 17:29:56 |
| 8 | A    I do. | 17:30:05 |
| 9 | Q    And the URL is FDS.Global? | 17:30:06 |
| 10 | A    It is. | 17:30:10 |
| 11 | Q    And on your website you provide an | 17:30:10 |
| 12 | accessibility statement; is that right? | 17:30:12 |
| 13 | A    I do. | 17:30:14 |
| 14 | Q    And the accessibility statement states, At | 17:30:14 |
| 15 | FDS Global we are committed to ensuring that our | 17:30:17 |
| 16 | website is accessible to the widest possible | 17:30:21 |
| 17 | audience including individuals with disabilities. | 17:30:23 |
| 18 | We firmly believe in providing an inclusive online | 17:30:26 |
| 19 | environment and strive to adhere to the Web Content | 17:30:29 |
| 20 | Accessible Guidelines, WCAG 2.1, which lay out the | 17:30:31 |
| 21 | standards for accessible web design.  Our objective | 17:30:37 |
| 22 | is to meet or exceed the requirements of these | 17:30:41 |
| 23 | guidelines to enable seamless website accessibility | 17:30:43 |
| 24 | for all users. | 17:30:47 |
| 25 | Does that sound right? | 17:30:48 |

Page 161

| | | |
|---|---|---|
| 1 | the data for Fashion Nova begins in 2013, that's | 18:01:02 |
| 2 | fine.  Yeah. | 18:01:06 |
| 3 | Q    Do you have any reliability concerns with | 18:01:13 |
| 4 | the Wayback Machine? | 18:01:18 |
| 5 | A    Not for the -- not for the days in which I | 18:01:21 |
| 6 | examined and one day in 2019 and the other five days | 18:01:27 |
| 7 | in 2020. | 18:01:33 |
| 8 | Q    Is the Wayback Machine widely accepted | 18:01:37 |
| 9 | within the ADA community as a reliable method for | 18:01:39 |
| 10 | evaluating web accessibility? | 18:01:43 |
| 11 | MR. COELHO:  Objection.  Misstates prior | 18:01:47 |
| 12 | testimony. | 18:01:48 |
| 13 | THE WITNESS:  I have no idea, but I do | 18:01:52 |
| 14 | know that the Wayback Machine is an accepted | 18:01:56 |
| 15 | way of examining websites from prior periods | 18:01:58 |
| 16 | across the industries I've worked in, not | 18:02:06 |
| 17 | including the ADA, and I have no idea about the | 18:02:09 |
| 18 | ADA. | 18:02:12 |
| 19 | BY MS. TUTUNDJIAN: | 18:02:13 |
| 20 | Q    So you don't know whether or not relying on | 18:02:14 |
| 21 | the Wayback Machine is considered a reliable method | 18:02:18 |
| 22 | in the ADA web accessibility industry? | 18:02:24 |
| 23 | MR. COELHO:  Objection.  Misstates prior | 18:02:31 |
| 24 | testimony.  Confusing.  You can answer. | 18:02:33 |
| 25 | THE WITNESS:  I have -- I have, first of | 18:02:36 |

Page 170

| | |
|---|---|
| 1 | all, never considered the ADA accessibility an | 18:02:42 |
| 2 | industry.  The website itself exists, it's been | 18:02:46 |
| 3 | captured.  And looking at it through the | 18:02:52 |
| 4 | Wayback Machine has never been in question.  I | 18:02:55 |
| 5 | mean, the bottom line is we're looking at the | 18:03:02 |
| 6 | source code, the underlying code which is not | 18:03:05 |
| 7 | changing. | 18:03:07 |
| 8 | So I don't know how other people within | 18:03:12 |
| 9 | the ADA space would have looked at.  So -- if | 18:03:14 |
| 10 | they would have used it or not. | 18:03:18 |
| 11 | BY MS. TUTUNDJIAN: | 18:03:19 |
| 12 | Q    So you do not know whether or not relying | 18:03:20 |
| 13 | on the Wayback Machine is considered to be a | 18:03:24 |
| 14 | reliable method for evaluating web accessibility? | 18:03:30 |
| 15 | MR. COELHO:  Objection.  Misstates prior | 18:03:35 |
| 16 | testimony.  You can answer. | 18:03:37 |
| 17 | THE WITNESS:  I -- when evaluating | 18:03:40 |
| 18 | websites, absolutely the Wayback Machine is a | 18:03:44 |
| 19 | solid way of looking at it.  Within the ADA | 18:03:47 |
| 20 | space, I do not know. | 18:03:51 |
| 21 | BY MS. TUTUNDJIAN: | 18:03:52 |
| 22 | Q    Okay.  And what is the basis for your | 18:03:52 |
| 23 | conclusion that the Wayback Machine is absolutely a | 18:04:00 |
| 24 | reliable method for evaluating websites outside of | 18:04:02 |
| 25 | the ADA context? | 18:04:05 |

Page 171

| | | |
|---|---|---|
| 1 | MR. COELHO:  Objection.  Vague as to | 18:04:08 |
| 2 | "Absolutely."  You can answer. | 18:04:10 |
| 3 | THE WITNESS:  I've used the Wayback | 18:04:18 |
| 4 | Machine for a variety of analysis involving | 18:04:18 |
| 5 | websites.  And to better understand what's | 18:04:26 |
| 6 | going on websites in a variety of cases.  It | 18:04:30 |
| 7 | has been consistently reliable and accurate. | 18:04:37 |
| 8 | So my experience. | 18:04:40 |
| 9 | BY MS. TUTUNDJIAN: | 18:04:42 |
| 10 | Q    So just your experience? | 18:04:43 |
| 11 | A    Yes. | 18:04:44 |
| 12 | Q    Has the Wayback Machine been peer-reviewed? | 18:04:46 |
| 13 | A    I have no idea. | 18:04:50 |
| 14 | Q    And has the Wayback Machine been accepted | 18:04:52 |
| 15 | by courts as a reliable method? | 18:04:57 |
| 16 | A    I believe that I have presented my findings | 18:05:05 |
| 17 | a couple times in the court.  I don't recall the | 18:05:09 |
| 18 | cases.  But the fact that I've used it in other | 18:05:14 |
| 19 | matters, the results would have been presented and | 18:05:17 |
| 20 | referenced back to the Wayback.  So it was accepted. | 18:05:21 |
| 21 | Q    Outside of the ADA context? | 18:05:28 |
| 22 | A    Yes. | 18:05:30 |
| 23 | Q    You state that you applied automated | 18:05:38 |
| 24 | testing of Deque on Fashion Nova's website for six | 18:06:10 |
| 25 | specific dates.  And you identify those dates on | 18:06:15 |

Page 172

| | | |
|---|---|---|
| 1 | BY MS. TUTUNDJIAN: | 18:10:28 |
| 2 | Q    Mr. Moody, you can answer. | 18:10:29 |
| 3 | A    So no, I haven't.  The six tests that were | 18:10:36 |
| 4 | run here, this is what I have.  This is what I gave | 18:10:38 |
| 5 | you. | 18:10:41 |
| 6 | Q    And so for purposes of your methodology, | 18:10:50 |
| 7 | you chose six discrete dates from the 42 | 18:10:51 |
| 8 | declarations that were provided to you, right? | 18:10:54 |
| 9 | A    That's correct. | 18:10:58 |
| 10 | Q    So you didn't capture all of the visit | 18:11:00 |
| 11 | dates? | 18:11:02 |
| 12 | A    No. | 18:11:06 |
| 13 | Q    And you noted in your report that -- | 18:11:09 |
| 14 | page 8 -- that Fashion Nova's website is fluid by | 18:11:26 |
| 15 | the nature of its industry always subject to | 18:11:34 |
| 16 | updating photos and customer discounts, and that's | 18:11:37 |
| 17 | paragraph 2. | 18:11:42 |
| 18 | A    Yes. | 18:11:46 |
| 19 | Q    So having reviewed Fashion Nova's website, | 18:11:50 |
| 20 | could you tell that it's a dynamic fluid website and | 18:11:52 |
| 21 | it changes and updates its content on a daily basis; | 18:11:56 |
| 22 | is that right? | 18:11:59 |
| 23 | A    It's a fluid website and it updates its | 18:12:03 |
| 24 | content.  I don't know with what frequency.  I would | 18:12:05 |
| 25 | say daily might be an overstatement, but it's fluid. | 18:12:11 |

Page 175

1      Q     Do you have any basis for stating that it's       18:12:20

2    an overstatement?  You don't know one way or the         18:12:23

3    other, right, how frequently Fashion Nova updates        18:12:26

4    its website?                                             18:12:30

5             MR. COELHO:  Objection.  Compound.              18:12:31

6        Argumentative.  You can answer.                      18:12:31

7             THE WITNESS:  I've not done an analysis of      18:12:36

8        the website to determine if changes are made on      18:12:38

9        a daily basis.  So my statement was basically        18:12:41

10       commentary to your question in the way in which      18:12:45

11       you proposed it.  So no, I did not have any          18:12:48

12       data that would suggest that the site is or is       18:12:51

13       not changed daily.                                   18:13:01

14   BY MS. TUTUNDJIAN:                                       18:13:03

15       Q    Okay.  And if a website did change daily,       18:13:04

16   then if a declarant, for example, in Item No. 1         18:13:10

17   visits the website on May 31, 2019, but you rely on     18:13:12

18   a Wayback capture from May 29, 2019, then you are       18:13:18

19   looking at a different version of Fashion Nova's        18:13:24

20   website?                                                 18:13:27

21             MR. COELHO:  Objection.  Argumentative.        18:13:31

22       You can answer.                                      18:13:32

23             THE WITNESS:  Yes.                             18:13:33

24   BY MS. TUTUNDJIAN:                                       18:13:35

25       Q    What is the meaning of the number of errors    18:13:41

Page 176

| | | |
|---|---|---|
| 1 | researching, and purchasing products." | 18:56:03 |
| 2 | A    Where are we now? | 18:56:06 |
| 3 | Q    Did I read that correctly? | 18:56:50 |
| 4 | A    Okay.  I found you. | 18:56:51 |
| 5 | Q    And then you identify some specific | 18:56:52 |
| 6 | examples of issues that you gathered from the | 18:56:54 |
| 7 | declarations, right? | 18:56:59 |
| 8 | A    Yes, ma'am. | 18:57:01 |
| 9 | Q    Did you personally interview any of the 42 | 18:57:03 |
| 10 | declarants? | 18:57:05 |
| 11 | A    No. | 18:57:08 |
| 12 | Q    Did you have any discussions with any of | 18:57:09 |
| 13 | the 42 declarants? | 18:57:11 |
| 14 | A    No. | 18:57:14 |
| 15 | Q    Did you ask to? | 18:57:15 |
| 16 | A    No. | 18:57:18 |
| 17 | Q    When reading the declarations, did it | 18:57:21 |
| 18 | strike you that many were similar in content? | 18:57:24 |
| 19 | A    I don't understand your question. | 18:57:33 |
| 20 | Q    When reading the 42 declarations, did you | 18:57:34 |
| 21 | notice similarities amongst them? | 18:57:36 |
| 22 | MR. COELHO:  Objection.  Vague.  You can | 18:57:40 |
| 23 | answer if you understand. | 18:57:42 |
| 24 | THE WITNESS:  They were disabled people | 18:57:49 |
| 25 | that visited your client's website and ran into | 18:57:52 |

Page 196

```
 1          problems.  Is there something more specific      18:57:56

 2          other than that?                                 18:58:01

 3     BY MS. TUTUNDJIAN:                                    18:58:02

 4          Q    No.  When reading the declarations, was it  18:58:03

 5     your understanding that the declarant had issues      18:58:05

 6     accessing Fashion Nova's website?                     18:58:09

 7          A    Say that again, please.                     18:58:11

 8          Q    Yeah.  When reading the declarations, was   18:58:13

 9     it your understanding that the declarants had issues  18:58:15

10     accessing Fashion Nova's website?                     18:58:20

11             MR. COELHO:  Objection.  Vague.  You can      18:58:23

12          answer.                                          18:58:24

13             THE WITNESS:  That is my understanding,       18:58:25

14          yes.                                             18:58:26

15             MS. TUTUNDJIAN:  I am going to introduce      18:58:35

16          Exhibit 8 followed by Exhibit 9 and both of      18:58:37

17          these exhibits are two declarations.             18:58:40

18             (Exhibit 8, Declaration of Amicizia Medrano   18:59:05

19             for Motion for Class Certification (No        18:59:06

20             Bates), was marked.)                          18:59:06

21             (Exhibit 9, Declaration of Latanya Shelton    18:59:07

22             for Motion for Class Certification (No        18:59:07

23             Bates), was marked.)                          18:59:07

24     BY MS. TUTUNDJIAN:                                    18:59:08

25          Q    So Mr. Moody, when you have access to       18:59:08
```

Page 197

| | | |
|---|---|---|
| 1 | Exhibit 8, please let me know. | 18:59:10 |
| 2 | A    Okay. | 18:59:50 |
| 3 | Q    Do you recognize this document? | 18:59:51 |
| 4 | A    It appears to be one of the declarations of | 19:00:06 |
| 5 | the 42. | 19:00:10 |
| 6 | Q    Okay. | 19:00:12 |
| 7 | A    Other than that, that's all I've got. | 19:00:14 |
| 8 | Q    Okay.  I will direct you to the final | 19:00:22 |
| 9 | paragraph which is paragraph 7 which states, "For | 19:00:24 |
| 10 | these reasons, it is impossible for me to use the | 19:00:30 |
| 11 | adidas website which I find regrettable." | 19:00:39 |
| 12 | A    Okay. | 19:00:42 |
| 13 | Q    Were you confused by this statement? | 19:00:42 |
| 14 | A    I'm sure I was.  One second.  Yes, it does | 19:00:52 |
| 15 | appear to be out of place. | 19:01:16 |
| 16 | Q    Did you ask for clarification? | 19:01:18 |
| 17 | MR. COELHO:  Objection.  Vague as to who. | 19:01:20 |
| 18 | You can answer. | 19:01:25 |
| 19 | THE WITNESS:  I don't recall.  It might | 19:01:32 |
| 20 | have been one of the other conversations, but I | 19:01:33 |
| 21 | don't have a direct recall on this statement or | 19:01:39 |
| 22 | this declarant. | 19:01:43 |
| 23 | BY MS. TUTUNDJIAN: | 19:01:45 |
| 24 | Q    Okay.  Moving on to Exhibit 9 which is | 19:01:45 |
| 25 | another plaintiff declaration.  Please let me know | 19:01:52 |

Page 198

| | | |
|---|---|---|
| 1 | when you've had a chance to review and whether you | 19:01:57 |
| 2 | recognize the document. | 19:01:59 |
| 3 | A    It's loaded.  I'm just looking at it right | 19:02:25 |
| 4 | now.  Okay? | 19:02:27 |
| 5 | Q    No problem. | 19:02:28 |
| 6 | A    Okay.  I reviewed it. | 19:02:50 |
| 7 | Q    I'll direct you to paragraph 8 where it | 19:02:52 |
| 8 | says, "For these reasons, it is impossible for me to | 19:02:57 |
| 9 | use the adidas website which I find regrettable." | 19:03:00 |
| 10 | Again, same conclusion as we just visited | 19:03:05 |
| 11 | with the other declaration, right? | 19:03:07 |
| 12 | A    Say that again, please. | 19:03:13 |
| 13 | Q    Yeah.  Same conclusion as we just visited | 19:03:14 |
| 14 | with the prior exhibit? | 19:03:16 |
| 15 | A    They both appear to have the same issue. | 19:03:21 |
| 16 | Q    Okay.  Did you ask for clarification as to | 19:03:23 |
| 17 | this statement? | 19:03:26 |
| 18 | MR. COELHO:  Objection.  Vague as to who. | 19:03:29 |
| 19 | You can answer. | 19:03:32 |
| 20 | THE WITNESS:  So it most likely was one of | 19:03:40 |
| 21 | the conversations I had, but I don't have any | 19:03:42 |
| 22 | direct recollection one way or the other about | 19:03:44 |
| 23 | it. | 19:03:47 |
| 24 | BY MS. TUTUNDJIAN: | 19:03:47 |
| 25 | Q    Do you know anything about the devices that | 19:03:48 |

Page 199

1    the declarants were using to access Fashion Nova's    19:03:51

2    website?    19:03:54

3          MR. COELHO:  Objection.  The document    19:03:55

4       speaks for itself.  You can answer.    19:03:55

5    BY MS. TUTUNDJIAN:    19:04:00

6       Q    Just any of the general 42 declarants?    19:04:01

7       A    I don't.  I don't know any of the specifics    19:04:05

8    about those devices.    19:04:10

9       Q    And do you know any specifics as to the    19:04:13

10   declarant's specific visual impairments?    19:04:17

11         MR. COELHO:  Objection.  Vague.  You can    19:04:23

12      answer if you understand.    19:04:25

13         THE WITNESS:  I don't understand the    19:04:28

14      question.  Are you asking me if I know their    19:04:29

15      medical diagnosis?    19:04:32

16   BY MS. TUTUNDJIAN:    19:04:34

17      Q    Yeah.  Like, basically what their visual    19:04:35

18   impairment is.    19:04:40

19      A    If it wasn't included in the website, I    19:04:42

20   wouldn't know.  So no, I do not.    19:04:44

21      Q    So how do you know that the issues that the    19:04:53

22   declarants encountered on Fashion Nova's website was    19:04:55

23   attributable to Fashion Nova's website as opposed to    19:04:59

24   any other number of variables?    19:05:04

25         MR. COELHO:  Objection.  Vague.    19:05:07

                                          Page 200

```
 1            code by physical review of the website.         19:08:42
 2                So it's the totality of everything that --   19:08:46
 3            everything that I did to come to the             19:08:52
 4            conclusion, not that a declarant made a          19:08:54
 5            statement of X.  That's just understanding what  19:09:00
 6            problems that person had.                        19:09:03
 7                And then all the testing that followed       19:09:05
 8            would either say yes or no.  I don't have a      19:09:07
 9            problem saying no or yes.  It's about what the   19:09:10
10            testing and the results provide.                 19:09:14
11      BY MS. TUTUNDJIAN:                                      19:09:16
12          Q    All right.  But your testing, to be clear,    19:09:18
13      was done in June of 2023 and declarants accessed       19:09:23
14      Fashion Nova's website in 2019 and 2020.               19:09:33
15              MR. COELHO:  Objection.  Vague.  You can       19:09:37
16          answer.                                            19:09:39
17              THE WITNESS:  That's correct.                  19:09:43
18      BY MS. TUTUNDJIAN:                                      19:09:44
19          Q    Moving on in your report you also state       19:09:47
20      that you reviewed Mr. Arumugam's report; is that       19:09:49
21      right?                                                 19:09:57
22          A    I read both expert reports, yes.             19:10:06
23          Q    Did you do anything other than read their    19:10:10
24      reports?                                               19:10:12
25          A    No.                                          19:10:15
```

Page 203

| | | | |
|---|---|---|---|
| 1 | Q | So you didn't perform any of the tests? | 19:10:16 |
| 2 | A | No. | 19:10:20 |
| 3 | Q | You didn't talk to Mr. Arumugam? | 19:10:21 |
| 4 | A | No. | 19:10:27 |
| 5 | Q | You didn't talk to Mr. Krosnick? | 19:10:27 |
| 6 | A | No. | 19:10:31 |
| 7 | Q | Okay.  So you have no way of assessing | 19:10:33 |
| 8 | | their methodology? | 19:10:36 |
| 9 | A | No.  I read a report that has background. | 19:10:42 |
| 10 | Q | Okay.  Moving on to the accessibility | 19:10:46 |
| 11 | | policy section of your report which is page 7. | 19:10:51 |
| 12 | A | I'm there. | 19:11:03 |
| 13 | Q | You state that Fashion Nova's website does | 19:11:04 |
| 14 | | not have a website accessibility policy; is that | 19:11:06 |
| 15 | | right? | 19:11:11 |
| 16 | A | At the time I reviewed it it did not. | 19:11:11 |
| 17 | Q | Okay.  And you state that a website | 19:11:14 |
| 18 | | accessibility policy serves as notice to the user of | 19:11:20 |
| 19 | | the website's owner's commitment to providing access | 19:11:24 |
| 20 | | to its website and the products and services the | 19:11:26 |
| 21 | | owner sells.  Is that right, in the first -- | 19:11:31 |
| 22 | A | Where are you reading from just so I can | 19:11:39 |
| 23 | | follow? | 19:11:41 |
| 24 | Q | The first sentence. | 19:11:42 |
| 25 | A | First sentence.  Okay.  That is what I | 19:11:45 |

Page 204

```
 1    BY MS. TUTUNDJIAN:                              19:30:58

 2        Q    Okay.   Looking at your conclusions, page 8,   19:31:00

 3    third paragraph from the bottom you state, "The    19:31:19

 4    failure of the defendant's website and its        19:31:23

 5    compatibility issues with screen readers does more  19:31:25

 6    than limit the access to online research and       19:31:29

 7    purchases.   It can and does impact the disabled user  19:31:31

 8    from accessing brick-and-mortar locations, phone   19:31:35

 9    numbers, and store hours thus preventing any       19:31:40

10    commerce with the store directly."                 19:31:43

11          Did I read that correctly?                   19:31:47

12        A    You did.                                  19:31:48

13        Q    How did you reach this conclusion?        19:31:49

14          MR. COELHO:   Objection.   The document      19:31:53

15       speaks for itself.   Are you asking him to      19:31:54

16       describe the whole methodology again?           19:31:56

17          MS. TUTUNDJIAN:   No, not the whole          19:31:58

18       methodology.   I want to focus on this          19:32:00

19       brick-and-mortar location because this is the   19:32:02

20       first time I've seen a reference to it in your  19:32:04

21       report.                                         19:32:08

22    BY MS. TUTUNDJIAN:                                 19:32:10

23        Q    So focusing specifically on this, I just  19:32:11

24    want to know, how did you reach this conclusion?   19:32:14

25    Because I didn't see it in your analysis or        19:32:19
```

Page 218

| | | |
|---|---|---|
| 1 | methodology. | 19:32:22 |
| 2 | A    Sure.   Issues with accessing | 19:32:25 |
| 3 | brick-and-mortar locations, phone numbers, store | 19:32:28 |
| 4 | hours and such I believe appeared within the | 19:32:31 |
| 5 | declarations provided.   The fact that the types of | 19:32:38 |
| 6 | information that -- the types of code that would | 19:32:45 |
| 7 | have held this information is consistent with the | 19:32:52 |
| 8 | issues that was identified as having problems both | 19:32:55 |
| 9 | from the automated testing and from mine. | 19:32:59 |
| 10 | So my conclusion is based on there were | 19:33:02 |
| 11 | people complaining about not being able to do this | 19:33:09 |
| 12 | and the website has issues, so that's how I drew my | 19:33:11 |
| 13 | conclusion. | 19:33:17 |
| 14 | Q    So you didn't do anything specifically to | 19:33:18 |
| 15 | assess whether or not disabled persons would be | 19:33:21 |
| 16 | impacted from accessing brick-and-mortar locations? | 19:33:29 |
| 17 | MR. COELHO:   Objection.   Misstates prior | 19:33:33 |
| 18 | testimony.   You can answer. | 19:33:35 |
| 19 | THE WITNESS:   The disabled users | 19:33:41 |
| 20 | themselves were able to identify that they had | 19:33:44 |
| 21 | issues and the code that was examined and the | 19:33:46 |
| 22 | website examined was consistent by showing that | 19:33:53 |
| 23 | there were errors with this type of data.   So | 19:33:57 |
| 24 | that's my conclusion. | 19:34:00 |
| 25 | So did I make phone calls and things like | 19:34:02 |

Page 219

| | |
|---|---|
| 1 | that?  No, I did not.  But the testing of the | 19:34:05 |
| 2 | code, the statements made by the declarants. | 19:34:09 |
| 3 | BY MS. TUTUNDJIAN: | 19:34:17 |
| 4 | Q    But you didn't do any specific analysis | 19:34:18 |
| 5 | whether as a manual or automated review to test | 19:34:24 |
| 6 | whether or not this is true? | 19:34:27 |
| 7 | MR. COELHO:  Objection.  Misstates prior | 19:34:28 |
| 8 | testimony.  Asked and answered.  You can | 19:34:29 |
| 9 | answer. | 19:34:32 |
| 10 | THE WITNESS:  No.  I did not. | 19:34:33 |
| 11 | BY MS. TUTUNDJIAN: | 19:34:44 |
| 12 | Q    So looking back on Exhibit 10 on the bottom | 19:34:44 |
| 13 | where we looked at "Contact us," there's also | 19:34:47 |
| 14 | another link next to it.  It says "Stores."  And so | 19:34:50 |
| 15 | I'm going to introduce Exhibit 12. | 19:34:56 |
| 16 | (Exhibit 12, Fashion Nova Locations page | 19:35:28 |
| 17 | (No Bates), was marked.) | 19:35:28 |
| 18 | BY MS. TUTUNDJIAN: | 19:35:29 |
| 19 | Q    Exhibit 12 is me just clicking on "Stores" | 19:35:29 |
| 20 | and that's the page that pulls up and it is a list | 19:35:32 |
| 21 | of physical locations, brick-and-mortar at Fashion | 19:35:37 |
| 22 | Nova.  But let me know when you've had an | 19:35:41 |
| 23 | opportunity to see the document. | 19:35:43 |
| 24 | A    Okay.  I have it loaded. | 19:35:55 |
| 25 | Q    So here we have a listing of Fashion Nova's | 19:35:58 |

Page 220

| | | |
|---|---|---|
| 1 | brick-and-mortar stores that are accessible on its | 19:36:04 |
| 2 | website. | 19:36:09 |
| 3 | A    Say that again, please. | 19:36:13 |
| 4 | Q    So here we have a listing of Fashion Nova's | 19:36:14 |
| 5 | five brick-and-mortar stores that are listed on its | 19:36:19 |
| 6 | website.  Do you see that? | 19:36:23 |
| 7 | A    I do. | 19:36:25 |
| 8 | Q    So given that this information is on | 19:36:36 |
| 9 | Fashion Nova's website, what is the basis for your | 19:36:39 |
| 10 | conclusion that visually impaired individuals can't | 19:36:41 |
| 11 | access information about Fashion Nova's | 19:36:44 |
| 12 | brick-and-mortar locations? | 19:36:46 |
| 13 | A    You had declarant stating that their screen | 19:36:51 |
| 14 | readers weren't interpreting this data. | 19:36:54 |
| 15 | Q    And that is the sole basis? | 19:36:58 |
| 16 | A    Yes. | 19:37:06 |
| 17 | Q    Moving on.  So the US Department of Justice | 19:37:11 |
| 18 | Civil Rights Division has issued a guidance on web | 19:37:19 |
| 19 | accessibility and the ADA. | 19:37:23 |
| 20 | Are you familiar with this guidance? | 19:37:25 |
| 21 | MR. COELHO:  Objection.  You can answer. | 19:37:32 |
| 22 | THE WITNESS:  No. | 19:37:38 |
| 23 | MS. TUTUNDJIAN:  Okay.  Let's look at my | 19:37:40 |
| 24 | next exhibit.  This is Exhibit 13. | 19:37:47 |
| 25 | /// | 19:38:16 |

Page 221

```
 1              (Exhibit 13, U.S. Department of Justice        19:38:16

 2              Guidance on Web Accessibility and the ADA      19:38:16

 3              (No Bates), was marked.)                       19:38:16

 4     BY MS. TUTUNDJIAN:                                      19:38:22

 5        Q    I will let you review this.  This is the       19:38:22

 6     guidance that I just referenced.  And then I will      19:38:25

 7     specifically focus on page 4.                          19:38:31

 8              MR. COELHO:  How much time do we have on       19:38:53

 9        the record?                                         19:38:54

10              THE VIDEOGRAPHER:  Five hours, 46 minutes.     19:39:08

11              MR. COELHO:  We're going to need another       19:39:18

12        court reporter.                                     19:39:20

13              MS. TUTUNDJIAN:  Oh, no.  I'm done.           19:39:20

14              MR. COELHO:  Oh, you are?                      19:39:22

15              MS. TUTUNDJIAN:  Yeah.  Assuming you have      19:39:25

16        minimal.                                            19:39:27

17              MR. COELHO:  Yeah.  Minimal.                   19:39:28

18              THE WITNESS:  Okay.  I'm on page 4.            19:39:32

19     BY MS. TUTUNDJIAN:                                      19:39:35

20        Q    Okay.  So on page 4 section it says, How to    19:39:35

21     make web content accessible to people with             19:39:44

22     disabilities."  And it states, "Businesses and state   19:39:46

23     and local governments have flexibility in how they     19:39:50

24     comply with the ADA's general requirements of          19:39:53

25     nondiscrimination and effective communication.  But    19:39:55
```

Page 222

| | | |
|---|---|---|
| 1 | they must comply with the ADA's requirements."  Goes | 19:39:57 |
| 2 | on to say, "The Department of Justice does not have | 19:40:01 |
| 3 | a regulation setting up detailed standards." | 19:40:03 |
| 4 | Did I read that correctly? | 19:40:08 |
| 5 | A    Can you read it again, please? | 19:40:16 |
| 6 | Q    Sure.  "Businesses and state and local | 19:40:18 |
| 7 | government have flexibility in how they comply with | 19:40:19 |
| 8 | the ADA's general requirements of nondiscrimination | 19:40:22 |
| 9 | and effective communication.  But they must comply | 19:40:26 |
| 10 | with the ADA's requirements.  The Department of | 19:40:28 |
| 11 | Justice does not have a regulations setting out | 19:40:30 |
| 12 | detailed standards." | 19:40:34 |
| 13 | A    You did read that correctly. | 19:40:53 |
| 14 | Q    So according to the US Department of | 19:40:54 |
| 15 | Justice, businesses like Fashion Nova have | 19:40:56 |
| 16 | flexibility in how they comply with the ADA's | 19:41:00 |
| 17 | general requirements; is that right? | 19:41:04 |
| 18 | A    According to this document from the | 19:41:13 |
| 19 | Department of Justice, that is what you read.  As | 19:41:15 |
| 20 | far as its -- you know, I'm not qualified to make a | 19:41:24 |
| 21 | legal opinion here.  I'm not an attorney, so ... | 19:41:36 |
| 22 | What you read is what's on the paper. | 19:41:38 |
| 23 | Q    And so the US Department of Justice does | 19:41:44 |
| 24 | not state that in order for a website to comply with | 19:41:48 |
| 25 | the ADA's requirements, it must adhere to the WCAG | 19:41:53 |

Page 223

| | | |
|---|---|---|
| 1 | Guidelines. | 19:42:06 |
| 2 | A    I'm sorry.  Say that again. | 19:42:08 |
| 3 | Q    I'll repeat it.  And so the US Department | 19:42:09 |
| 4 | of Justice does not state that in order for a | 19:42:14 |
| 5 | website to comply with the ADA's requirements it | 19:42:16 |
| 6 | must adhere to the WCAG Guidelines. | 19:42:19 |
| 7 | A    I don't see where you're reading from. | 19:42:27 |
| 8 | Q    I'm not reading from anywhere.  I'm saying | 19:42:30 |
| 9 | is there anything -- is there any indication in the | 19:42:32 |
| 10 | guidelines from the US Department of Justice that | 19:42:35 |
| 11 | says that in order for a website to comply with the | 19:42:38 |
| 12 | ADA's requirements it must adhere to the WCAG | 19:42:43 |
| 13 | Guidelines? | 19:42:47 |
| 14 | A    Other than existing technical standards | 19:42:49 |
| 15 | provide helpful guidance concerning how to ensure | 19:42:51 |
| 16 | accessibility of website features, these include | 19:42:55 |
| 17 | WCAG, I don't see anything else referencing WCAG on | 19:42:59 |
| 18 | this page. | 19:43:06 |
| 19 | Q    So you would agree that Fashion Nova's | 19:43:14 |
| 20 | website does not need to adhere to WCAG in order to | 19:43:19 |
| 21 | comply with the ADA? | 19:43:24 |
| 22 | MR. COELHO:  Objection.  Misstates prior | 19:43:26 |
| 23 | testimony. | 19:43:27 |
| 24 | THE WITNESS:  Okay.  So respectfully, I | 19:43:37 |
| 25 | don't agree with you because the ADA | 19:43:40 |

Page 224

| | | |
|---|---|---|
| 1 | requirements are vague at best and there needs | 19:43:43 |
| 2 | to be a standard in a series of guidelines. | 19:43:49 |
| 3 | And the World Wide Consortium set out the WCAG | 19:43:51 |
| 4 | Guidelines to provide a structure so that | 19:43:55 |
| 5 | websites can be in compliance.  Okay? | 19:44:00 |
| 6 | The only real test for whether or not a | 19:44:04 |
| 7 | website is in compliance is whether or not | 19:44:08 |
| 8 | people with disabilities have problems with | 19:44:12 |
| 9 | that website.  If they have problems, it's | 19:44:14 |
| 10 | something to look into. | 19:44:20 |
| 11 | The WCAG standard is a way of testing | 19:44:23 |
| 12 | one's website to see that issues within the | 19:44:27 |
| 13 | technology can be resolved.  Okay?  So there's | 19:44:33 |
| 14 | nothing on this page that says that one has to | 19:44:41 |
| 15 | comply with -- or the Department of Justice is | 19:44:46 |
| 16 | saying that you have to comply with the WCAG | 19:44:50 |
| 17 | standard, but I don't think you can separate | 19:44:52 |
| 18 | the WCAG Guidelines from the ADA requirements | 19:44:54 |
| 19 | because there has to be some standards, there | 19:45:02 |
| 20 | has to be things in which you're doing. | 19:45:04 |
| 21 | Otherwise the ADA itself doesn't -- doesn't | 19:45:06 |
| 22 | exist. | 19:45:16 |
| 23 | You know, it doesn't have a way of | 19:45:17 |
| 24 | providing a level of interoperability for | 19:45:20 |
| 25 | people that need it. | 19:45:27 |

Page 225

```
1     BY MS. TUTUNDJIAN:                              19:45:32

2         Q    So is it your testimony that the US    19:45:32

3     Department of Justice's guidelines are inaccurate?  19:45:34

4              MR. COELHO:  Objection.  Misstates prior  19:45:39

5         testimony.  Argumentative.  You can answer.  19:45:42

6              THE WITNESS:  I think what I'm saying is  19:45:45

7         if I would have read that full sentence that --  19:45:47

8         or the full paragraph, "Existing technical   19:45:50

9         standards provide helpful guidance concerning  19:45:55

10        how to ensure accessibility of website       19:45:55

11        features.  These include the Web Content      19:45:59

12        Accessibility Guidelines, WCAG, and the      19:46:03

13        Section 508 standards, which the Federal      19:46:08

14        Government uses for its own website."         19:46:09

15            So for the Federal Government to be in    19:46:13

16        compliance, they're using the standards of WCAG  19:46:17

17        and Section 508 to meet that requirement.    19:46:20

18            So I don't know if that answers your      19:46:31

19        question.  So being able to comply with WCAG is  19:46:32

20        an important part of being able to meet the ADA  19:46:39

21        requirement.                                  19:46:44

22    BY MS. TUTUNDJIAN:                               19:46:46

23        Q    So my question is, is it your testimony  19:46:47

24    that a website must adhere to the WCAG in order to  19:46:53

25    comply with the ADA?                             19:47:02
```

Page 226

| | | |
|---|---|---|
| 1 | MR. COELHO:  Objection.  Calls for a legal | 19:47:05 |
| 2 | conclusion.  You can answer. | 19:47:06 |
| 3 | THE WITNESS:  I'm not an attorney, but I | 19:47:14 |
| 4 | think the applicability of a website in meeting | 19:47:15 |
| 5 | the WCAG standards goes a long way to | 19:47:22 |
| 6 | determining whether or not there are issues and | 19:47:26 |
| 7 | barriers with that website. | 19:47:30 |
| 8 | BY MS. TUTUNDJIAN: | 19:47:32 |
| 9 | Q    Is it necessary for a website to comply | 19:47:32 |
| 10 | with the WCAG in order to be ADA-complaint? | 19:47:38 |
| 11 | MR. COELHO:  Same objection. | 19:47:44 |
| 12 | THE WITNESS:  Again, I'm not an attorney. | 19:47:49 |
| 13 | I can't make the legal call here.  But | 19:47:50 |
| 14 | compliance with WCAG goes a long way to help | 19:47:56 |
| 15 | establishing that the website components would | 19:48:00 |
| 16 | operate appropriately for a disabled person and | 19:48:06 |
| 17 | therefore it would be in ADA compliance.  I | 19:48:11 |
| 18 | don't think you can separate the two. | 19:48:15 |
| 19 | BY MS. TUTUNDJIAN: | 19:48:18 |
| 20 | Q    I can appreciate that, but what I'm trying | 19:48:18 |
| 21 | to get at is you're saying it goes a long way.  My | 19:48:20 |
| 22 | question is different.  Which is, is it necessary | 19:48:24 |
| 23 | for a website, like Fashion Nova's, to comply with | 19:48:28 |
| 24 | the WCAG Guidelines in order to be ADA-complaint? | 19:48:33 |
| 25 | MR. COELHO:  Same objections. | 19:48:40 |

Page 227

```
 1              THE WITNESS:  I think that the compliance      19:48:51
 2      with WCAG addresses -- I think that the               19:48:53
 3      compliance with WCAG establishes whether or not       19:49:04
 4      the components of the website would operate in        19:49:07
 5      a way in which disabled people could                  19:49:13
 6      effectively use the website.                          19:49:17
 7              If one is not -- if a website is not           19:49:24
 8      compliant with WCAG, then most likely they will       19:49:28
 9      have a variety of issues and barriers which           19:49:44
10      would absolutely cause them not to be                 19:49:47
11      ADA-complaint.                                        19:49:51
12              So I don't know of a provision that has        19:49:54
13      ever said you have to be WCAG-compliant, but I        19:50:02
14      don't think that's how the standard is being          19:50:06
15      applied for people within this space or the           19:50:09
16      Federal Government.                                   19:50:13
17              It's a standard -- it's a standard to be       19:50:17
18      measured and tested against and that's how it's       19:50:19
19      being applied.  But as far as a hard fast rule,       19:50:25
20      I haven't seen one.                                   19:50:27
21      BY MS. TUTUNDJIAN:                                    19:50:30
22          Q    And it's not the only standard, right?       19:50:31
23              As the Department of Justice's website         19:50:33
24      says, "Businesses and state and local governments     19:50:35
25      have flexibility in how they comply with the ADA's    19:50:38
```

Page 228

1      requirements."                                    19:50:41

2              And the WCAG is just one of the standards.  19:50:41

3      Section 508 is another of the standards.           19:50:45

4          A    That's correct.  But I believe 508 has    19:50:51

5      limitations and it's specifically towards          19:50:53

6      governmental entities.                             19:50:57

7          Q    But the point being is there are other    19:50:58

8      standards and there is flexibility?                19:51:01

9          A    Well, if we're talking about government   19:51:03

10     websites, there are definitely two standards that -- 19:51:06

11     according to this document that they're following.  19:51:09

12     But if 508 doesn't apply to commercial websites,    19:51:11

13     then WCAG is sort of the default standard is being  19:51:21

14     applied across the board here, right?              19:51:30

15             So as other standards, yeah, this document  19:51:32

16     being from a government entity is reflecting more   19:51:37

17     than one standard.                                 19:51:40

18         Q    But this document does more than that.     19:51:42

19     This document isn't focused on just government      19:51:44

20     websites.  It's saying businesses and state and    19:51:46

21     local governments have flexibility in how they     19:51:49

22     comply with the ADA requirements.  It then offers  19:51:52

23     two exemplar guidelines.                           19:51:56

24             MR. COELHO:  Objection.                     19:52:00

25     ///                                                19:52:01

                                                      Page 229

```
 1    BY MS. TUTUNDJIAN:                              19:52:01

 2        Q    My question to you is, would you agree that  19:52:02

 3    websites such as Fashion Nova have flexibility in    19:52:08

 4    how they comply with the ADA's requirements?         19:52:11

 5            MR. COELHO:  Objection.  Argumentative.       19:52:15

 6        Asked and answered.  Harassing the witness.       19:52:15

 7        You can answer.                                   19:52:21

 8            THE WITNESS:  Okay.  The document does         19:52:22

 9        specifically begin with stating that businesses   19:52:23

10        and state and local governments have             19:52:25

11        flexibility in how they comply with the ADA       19:52:26

12        general requirements of non-discrimination and    19:52:29

13        effective communication.  But they must comply    19:52:32

14        with the ADA requirements.                        19:52:36

15            Then jumping down three paragraphs we get     19:52:39

16        into the middle of that third paragraph and two   19:52:43

17        standards were identified, one of them being      19:52:51

18        WCAG, the other one being Section 508 standard    19:52:54

19        which it states that the Federal Government       19:52:59

20        uses for its own website.                         19:53:01

21            We're back to the whole point of the first    19:53:05

22        paragraph, the last sentence is probably the      19:53:09

23        most important part of whatever a company does    19:53:13

24        or a business does, they must comply with the     19:53:17

25        ADA standard.  So the question becomes how does   19:53:20
```

Page 230

| | | |
|---|---|---|
| 1 | one comply with the ADA standard and how does | 19:53:24 |
| 2 | one show that they're in compliance? | 19:53:27 |
| 3 | Well, if you don't -- the ADA isn't going | 19:53:31 |
| 4 | to provide you that information because when | 19:53:34 |
| 5 | you're dealing with the fluid dynamic nature of | 19:53:36 |
| 6 | a website such as Fashion Nova, you better have | 19:53:42 |
| 7 | something to test against and show that you've | 19:53:44 |
| 8 | addressed issues or that these issues don't | 19:53:47 |
| 9 | exist or whatever. | 19:53:49 |
| 10 | And in this case the Web Content | 19:53:51 |
| 11 | Accessibility Guideline is there.  And in | 19:53:54 |
| 12 | testing Fashion Nova against WCAG, there are | 19:53:59 |
| 13 | issues. | 19:54:07 |
| 14 | So I agree with you that's what the | 19:54:09 |
| 15 | document says.  I don't think that it's clear | 19:54:11 |
| 16 | as to how one is to comply with ADA | 19:54:14 |
| 17 | requirements unless they have a standard to | 19:54:19 |
| 18 | remediate to and to test to.  And that would be | 19:54:21 |
| 19 | WCAG. | 19:54:25 |
| 20 | BY MS. TUTUNDJIAN: | 19:54:26 |
| 21 | Q   Right.  But the page again says these | 19:54:28 |
| 22 | include the WCAG and Section 508. | 19:54:31 |
| 23 | Is there anything in this guidance from the | 19:54:35 |
| 24 | Department of Justice that says that the only way | 19:54:38 |
| 25 | for a website to be ADA-complaint is by adhering to | 19:54:41 |

Page 231

```
 1    the WCAG Guidelines?                              19:54:45

 2        A    There is nothing there that says that    19:54:52

 3    compliance can only be met through the WCAG       19:54:54

 4    Guidelines.  But there's nothing there that says  19:54:55

 5    that other than they must comply with the ADA     19:54:59

 6    requirement.                                      19:55:03

 7             And this document fails to describe exactly 19:55:03

 8    how a website would be ADA -- would comply with   19:55:06

 9    those requirements, except for later referencing  19:55:11

10    that WCAG is what the Federal Government uses in its 19:55:15

11    own website.                                      19:55:19

12        Q    Well, not quite.  It says, "Existing     19:55:21

13    technical standards provide helpful guidance      19:55:24

14    ensuring how to ensure accessibility of website   19:55:27

15    features, these include the WCAG and Section 508  19:55:30

16    standards which the Federal Government uses for its 19:55:34

17    own websites."                                    19:55:36

18             So it's not saying that you have to use  19:55:37

19    WCAG, nor is it saying you have to use Section 508. 19:55:42

20             MR. COELHO:  Objection.  Argumentative.  19:55:48

21        Counsel is testifying.  The document speaks for 19:55:51

22        itself.  Asked and answered.  You can answer. 19:55:51

23             THE WITNESS:  Respectfully, I also think 19:55:58

24        you misstated what my testimony was.  What I  19:55:59

25        said is that the WCAG Guidelines were         19:56:04
```

Page 232

| 1 | identified and the Federal Government uses it | 19:56:08 |
| 2 | in its own website. | 19:56:13 |
| 3 | I didn't say anything about it having to | 19:56:14 |
| 4 | have been used, but the Federal Government is | 19:56:16 |
| 5 | using it.  The closest thing to "you must | 19:56:18 |
| 6 | comply with the ADA requirements" and here's | 19:56:23 |
| 7 | what we're doing, is basically what they're | 19:56:26 |
| 8 | saying here. | 19:56:28 |
| 9 | BY MS. TUTUNDJIAN: | 19:56:29 |
| 10 | Q    Is it your testimony that this document, | 19:56:29 |
| 11 | the guidelines for the DOJ say that we are adhering | 19:56:31 |
| 12 | and following the WCAG and Section 508 standards and | 19:56:37 |
| 13 | so should you? | 19:56:41 |
| 14 | MR. COELHO:  Objection.  Misstates prior | 19:56:47 |
| 15 | testimony.  Misstates the document.  You can | 19:56:49 |
| 16 | answer. | 19:56:51 |
| 17 | THE WITNESS:  The document states, | 19:56:51 |
| 18 | "Existing technical standards provide helpful | 19:56:52 |
| 19 | guidance concerning how to ensure accessibility | 19:56:56 |
| 20 | of website features.  These include the Website | 19:57:00 |
| 21 | Content Accessibility Guidelines and | 19:57:02 |
| 22 | Section 508 standard.  Which the Federal | 19:57:04 |
| 23 | Government uses for its own website." | 19:57:07 |
| 24 | So it's stating that the Federal | 19:57:13 |
| 25 | Government uses WCAG in the process of | 19:57:14 |

Page 233

| | | |
|---|---|---|
| 1 | maintaining, managing the website, testing the | 19:57:23 |
| 2 | website, ensuring compliance.  And the only | 19:57:25 |
| 3 | compliance is back to complying with ADA | 19:57:28 |
| 4 | requirements. | 19:57:30 |
| 5 | BY MS. TUTUNDJIAN: | 19:57:31 |
| 6 | Q    Well, it says it uses WCAG and Section 508. | 19:57:32 |
| 7 | So again, my question is, does the US DOJ's guidance | 19:57:35 |
| 8 | state that a website such as Fashion Nova's must | 19:57:42 |
| 9 | adhere to the WCAG in order to comply with the ADA? | 19:57:46 |
| 10 | That is all I'm asking. | 19:57:52 |
| 11 | MR. COELHO:  Same objections. | 19:58:00 |
| 12 | THE WITNESS:  This document does not | 19:58:00 |
| 13 | define ADA requirements as it relates to WCAG | 19:58:01 |
| 14 | or anything else. | 19:58:09 |
| 15 | BY MS. TUTUNDJIAN: | 19:58:17 |
| 16 | Q    Aside from defining ADA requirements, does | 19:58:17 |
| 17 | it state anywhere in the guidelines that you have to | 19:58:20 |
| 18 | adhere to the WCAG in order to be ADA-complaint? | 19:58:23 |
| 19 | MR. COELHO:  Objection.  Document speaks | 19:58:31 |
| 20 | for itself.  Asked and answered. | 19:58:31 |
| 21 | Argumentative.  You can answer. | 19:58:32 |
| 22 | THE WITNESS:  The document only states | 19:58:38 |
| 23 | that businesses, state and local governments | 19:58:41 |
| 24 | must comply with the ADA requirements, but it | 19:58:44 |
| 25 | does not define it.  And then it references | 19:58:46 |

Page 234

| | | |
|---|---|---|
| 1 | WCAG is being used on Federal Government | 19:58:49 |
| 2 | websites. | 19:58:54 |
| 3 | BY MS. TUTUNDJIAN: | 19:58:54 |
| 4 | Q    And it says that businesses and state and | 19:58:54 |
| 5 | local governments have flexibility in how they | 19:58:57 |
| 6 | comply with the ADA requirements, correct? | 19:58:59 |
| 7 | A    It does say that, yes. | 19:59:06 |
| 8 | MS. TUTUNDJIAN:  All right.  I have no | 19:59:12 |
| 9 | further questions. | 19:59:13 |
| 10 | MR. COELHO:  Okay.  Let's go off the | 19:59:13 |
| 11 | record. | 19:59:14 |
| 12 | THE VIDEOGRAPHER:  We are off the record. | 19:59:16 |
| 13 | The time is 7:59 p.m. | 19:59:18 |
| 14 | (Off the record.) | 19:59:22 |
| 15 | THE VIDEOGRAPHER:  We are back on the | 20:03:35 |
| 16 | record.  The time is 8:03 p.m. | 20:03:35 |
| 17 | MR. COELHO:  All right.  I just have a few | 20:03:40 |
| 18 | questions.  Thank you for taking the time.  I | 20:03:42 |
| 19 | know it's been a long day for you, especially | 20:03:46 |
| 20 | being on the east coast. | 20:03:48 |
| 21 | | 20:03:49 |
| 22 | EXAMINATION | 20:03:49 |
| 23 | | 20:03:50 |
| 24 | BY MR. COELHO: | 20:03:50 |
| 25 | Q    Earlier in the deposition you mentioned not | 20:03:50 |

Page 235

```
1              REPORTER'S CERTIFICATE
2         I, VICTORIA A. GUERRERO, California Certified Shorthand
3    Reporter, Registered Diplomate Reporter, Registered Merit
4    Reporter, Certified Realtime Reporter, do hereby certify
5    that, pursuant to Federal Rules of Civil Procedure, ROBERT
6    D. MOODY appeared remotely before me at the time and place
7    mentioned in the caption herein; that the witness was, by
8    me, first duly sworn/affirmed under oath and examined upon
9    oral interrogatories propounded by counsel;
10        that said examination together with the testimony of
11   said witness was taken down by me in stenotype and
12   transcribed through computer-aided transcription; I further
13   certify that I am not a relative or employee of any attorney
14   of the parties, nor financially interested in the action;
15        and the foregoing transcript, pages 1 through 238,
16   review requested by the witness or a party, constitutes a
17   full, true, and correct record of such testimony adduced and
18   oral proceedings had and of the whole thereof.
19        WITNESS MY HAND AND DIGITAL SIGNATURE this Thursday,
20   November 2, 2023.
21
22
23   Victoria A. Guerrero, CSR, RDR, RMR, CRR
     Oregon CSR No. 14-0428   (exp. 9-30-2024)
24   Washington CCR No. 3293   (exp. 3-15-2024)
     California CSR No. 8370   (exp. 3-15-2024)
25   Hawaii CSR No. 490        (exp. 12-31-2023)
```

Page 240

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

JUAN ALCAZAR, individually and on
Behalf of others similarly situated,
     Plaintiff,

vs.

FASHION NOVA, INC., a California
Corporation; and DOES 1 TO 10, inclusive,
     Defendants.
_____ /

## <u>Expert Report of Robert D. Moody</u>

Forensic Data Services, Inc., d/b/a FDS Global (hereafter referred to as FDS Global), have been retained by the Wilshire Law Firm on behalf of its client(s), who includes Juan Alcazar.

The Wilshire Law Firm, in this present case, has brought a class action lawsuit alleging the Defendant, Fashion Nova, Inc's website contains barriers that prevent the use of the website by disabled persons, the Plaintiff being one.

I, Robert D. Moody, am the President, CEO, and Principal Investigator for FDS Global. I am certified in the areas of Information Systems Auditing, Information Security, and Computer Forensics, among others.

I have undertaken and completed training relating to the ADA application to websites and the development and use of websites by disabled persons.

I have been asked and authored ADA audit reports on approximately 2000 different websites.

I have provided my expertise to both Plaintiffs and Defendants and have on occasion been asked to help Defendants remediate their websites post-settlement and to provide post-settlement evaluations of websites once remediation efforts have been completed.

I am being compensated at a rate of $450/hour. No part of my compensation is contingent upon my opinion.



To further improve its FDS Global has partnered with Deque Systems, Inc., a leader in the ADA website issue identification and remediation space, and have incorporated its identification software and methodologies into FDS' own practices for website auditing and reporting. I have attached my CV as **Exhibit 1** to better explain my education and experience.

## Defendant website

The Defendant's website, as identified in the complaint, is https://www.fashionnova.com. This is the website FDS Global evaluated and is the subject of this report.

## Material Reviewed as part of FDS' Examination

FDS was retained to audit the afore-identified website and to render an opinion as to whether or not the website https://www.fashionnova.com included barriers that would prevent disabled persons, such as the Plaintiff, Mr. Juan Alcazar, from using the website.

As part of my review, I was provided with the following supporting information:

- 42 declarations were submitted by disabled persons who attempted to use the afore-identified website.

- Expert report of Accessibility Consultant, Kannan Arumugam.

- Expert report of Dr. Jon A. Krosnick.

Additionally, I have access to the website located at https://www.fashionnova.com as well as earlier instances of the website through the Wayback machine located at web.archive.org.

The above information was reviewed as to create an understanding of the issues and facts in this matter. All opinions and conclusions are based on my work and the results from my testing and analysis.

## Review Process

FDS Global's review process can be summarized as follows:

- First, there is a review of the complaint and all supporting material. This is to identify both general and specific issues raised with Defendant's website.

- Second, a manual review of the website is performed to test the elements of WCAG as well as any concerns raised in paragraph 16.

- Third, Automated analysis of Defendant's website using industry standard tools that may include WAVE and Deque.

- Fourth, A review of any third-party accessibility software or widgets (if any exist) are reviewed and tested to determine if the add-on features improve accessibility.

- Fifth, when possible, a review of earlier websites is performed through the Wayback machine in an attempt to understand whether or not the issues (if any exist) are systemic to the site or whether they are specific to the version that is active at the time of the review.

- Sixth, the website's accessibility policy (if it exists) is reviewed and tested. This is to identify if Defendant has provided an alternate means for its patrons to access the store's resources and obtain the information and/or make the purchase the patron could not accomplish through the direct use of the website.

**Issues Raised in Declarations by Plaintiff and Others**

A review of 42 declarations, provided by Plaintiff's counsel, showed that all patrons were attempting to visit the https://www.fashionnova.com website for the purpose of researching and purchasing products sold by Fashion Nova.

In each of the 42 declarations reviewed, the attempt to access the website and use assistive technology resulted in barriers occurring thus making it impossible for the declarant from accessing, researching, and purchasing products.

Specific examples of the issues include but are not limited to:

- Issues with the website loading into the Plaintiff's screen reader and having its contents properly and clearly interpreted so that the patron could understand what was being relayed by the software, for that portion of the website.

- There was a conflict in content being loaded when it had to be interpreted by the screen reader.

- Contrast issues.

- Links contained within the website were broken, unavailable or lacked proper functionality.

- Links and pictures lacked descriptions and could not be properly interpreted by screen readers.

- Functionality and workflow of the site did not work correctly when a screen reader was enabled.

## Issues Identified by Kannan Arumugam, Accessibility Consultant

Mr. Arumugam's testing of Defendant's website mirrored how Plaintiff(s) would have accessed the site.

The testing employed by Mr. Arumugam identified many of the issues identified by the patrons who submitted declarations and are referenced above.

Issues identified include but are not limited to:

- Links could not be interpreted by the screen reader software.

- Color Contrast issues exist.

- Images and links lacked Alt-Text thus hindering screen readers' interpretation of the link or the image's content.

- Forms found on the website were not properly designed and could not be interpreted using assistive technology.

- Program issues exist thus making the use of a keyboard-only environment impossible.

## Manual Review of https://www.fashionnova.com

The manual review FDS performs of Defendant's website is a key component in understanding how a website behaved given the different variables each Plaintiff would bring with their technology.

FDS' review used different computer operating systems, different screen readers, and different web browsers among other variables.

During its testing WCAG guidelines provided the standard for FDS' review. This allowed FDS to evaluate the site and its components but also claims made by the Declarant and the accessibility consultant.

In its review, FDS identified that there is an issue in the website in the way in which it interacts with different screen readers.

The screen readers do not work properly on the Defendant's website and will begin and stop reading content without user interaction, skip content, skip over links and text if the interaction is required and the user pauses for too long.

A contrast check was performed and found that some images failed the WCAG recommended color balance. This was further verified in the automated testing.

The forms and special features such as the checkout feature will cause the system to freeze or in the alternative stop the screen reader from working correctly.

Simpler issues such as account links, images having no alternate text, being mislabeled, or having program issues causing the screen reader to skip them altogether exist as well.

**Automated Review Tools**

Two ADA Site audit tools were used to evaluate the current version of the website. These tools are:

- WAVE
- Deque

These tools are designed to examine the website's logic and computer code for issues that would create barriers to the website's use by disabled patrons.

The main advantage of using these programs is that it allows for an effective way to look for issues that may be hidden from the naked eye and point toward systemic design problems or flaws.

FDS evaluated the Defendant's current website with WAVE.  As described, the software evaluated the website's code and logic for issues that would point to the creation of barriers for disabled patrons.

WAVE identified the following:

- Errors               126
- Contrast Errors    11
- Alerts               26
- Features            19

- Structural Elements      72
- Aria Issues      121

Deque Site Evaluation was performed, and the following were identified:

- Total Issues:      444
- Critical:      358
- Serious:      74
- Moderate:      1
- Minor:      11

The two reports provide data regarding the logic and programming and where issues exist that would create barriers for disabled patrons. These reports strongly suggest that critical operations are being overlooked and thus making the use of the website an impossibility for those with disabilities.

### 3rd Party Accessibility Software and Widgets

This website does not employ 3rd Party Accessibility Software or Widgets as a way to overcome the technical issues being experienced by patrons.

### Earlier Website Review

FDS reviewed the 42 Declarations provided by Plaintiff's Counsel. These declarations provided that the Defendant's website was accessed in 2019 but the majority of the access was in 2020.

No matter the date of access, the Declarant stated that they had issues with navigating the Defendant's website, even with the use of assistive technologies such as screen readers.

The Internet Archive Wayback machine (hereafter referred to as Wayback) is a website archival tool owned by the Internet Archive, a non-profit whose mission is to build "a digital library of Internet sites and other cultural artifacts in digital form."

Wayback uses computer programs known as "bots" or "spiders" to capture the contents of websites. The bots are autonomous and crawl across the internet looking for data to copy/capture and then return and store the information.

Wayback's portal provides users with a place to put in a URL for a particular website. If the website had been captured, information about the website is displayed.

In the case of the Defendant's website, Wayback has captured the site 4,752 times between 2004 and 2023.

Based on the Declarations reviewed, the Declarants stated that their access was primarily in the months of August, September, and October 2020.

During this time period, Wayback captured and stored 61 renditions of Defendant's website.

Using a combination of Wayback and the automated testing of Deque, FDS was able to test the Defendant's website for specific dates in 2019 and 2020.

The following chart identifies a date the Defendant's website was visited by a Declarant, the date Wayback captured a copy of the website, and errors identified by the Deque software.

| Item # | Visit Date | Wayback Capture | Errors |
|--------|-----------|-----------------|--------|
| 1 | 5/31/2019 | 5/29/2019 | 46 |
| 2 | 8/2/2020 | 8/5/2020 | 86 |
| 3 | 8/27/2020 | 8/29/2020 | 85 |
| 4 | 9/1/2020 | 9/1/2020 | 81 |
| 5 | 9/15/2020 | 9/19/2020 | 128 |
| 6 | 10/6/2020 | 10/7/2020 | 121 |

The data presented is representative of the errors that existed in the Defendant website and strongly suggests that there are systemic or programmatic errors that existed at this time and well into the present.

**Defendant's Website Accessibility Policy**

The accessibility policy (hereafter referred to as AP) on any website serves as notice to the user of the website's owner's commitment to providing access to its website and the products and services the owner sells. Additionally, the AP provides an alternate means for the patron to connect with the owner and receive assistance in obtaining information, researching products and services, making purchases, returns and conduct whatever business the patron may have or would have conducted through the website itself.

Not having an AP or not having a properly functioning AP is a barrier for disable patrons and will prevent the disabled patron from being able to use and interact with the company on any level.

In the current matter, FDS checked the current website for an accessibility policy. None could be found.

Additionally, using Wayback, FDS checked earlier versions of the Defendant's website, specifically at or around the dates the Declarant accessed the website and no AP could be found.

**Conclusion**

The data and documents provided to FDS, for its review, clearly show that the Defendant's website located at https://www.fashionnova.com has been systematically and programmatically flawed since at least 2018 and thus has created barriers for disabled patrons for years.

The Defendant's website is fluid by the nature of its industry always subject to updating photos and customer discounts in an attempt to drive traffic and sales. Unfortunately, where there are issues with picture contrasts or proper alternate texts for the newly added items, the main issues have to do with operational and program issues that are magnified when a disabled user has to use assistive technology during their visit to the website.

Whether it be from the declarations, the testing by other accessibility consultants, or from FDS' own analysis, the record is clear, and Defendant's website has major issues when a user is accessing the website while using screen readers or other ADA-approved assistive technologies.

Once the site falters or fails, a company that has an Accessibility Policy and provides dedicated phone numbers and emails can provide an alternate means for the disabled patron to continue or save their shopping experience.

In the present case, this is not possible as the Defendant does not provide this option.

The failure of the Defendant's website and its compatibility issues with screen readers does more than limit the access to online research and purchases. It can and does impact the disabled user from accessing brick-and-mortar locations, phone numbers, and store hours thus preventing any commerce with the store directly.

To conclude, it is my opinion, and based upon reasonable scientific certainty that the Defendant, Fashion Nova Inc., who operates the website https://www.fashionnova.com, has program and design issues in its website that has been systemic for years and as such has created access barriers for disabled users that are both physical and digital in nature and thus violates the disabled users rights as provided under the ADA.

The Defendant's ability to provide a WCAG compliant website does not appear to have been undertaken and even though an alternate means for providing assistance in the event of a website issue is available to the Defendant, a properly functioning Accessibility Policy, the Defendant has not availed themselves of this option.

As presented in the declarations provided, a disabled user, using assistive technology such as a screen reader, would be frustrated by the Defendant's website partially failing or crashing thus preventing its use and forcing the disabled user to disconnect and not complete his or her business with the Defendant. Given that no alternate means was available to the disabled user, as well as creating the physical barrier of preventing the disabled user from locating phone numbers, store locations, and hours of operation is out of the question.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Respectfully Submitted,

Robert D Moody
Rmoody@fds.global
(954) 727 – 1957

23 June 2023

# EXHIBIT 1



# Robert D. Moody

 

## Contact Information

**Robert D. Moody**
Forensic Data Services, Inc. (d/b/a FDS Global)
3325 South University Drive, Suite 206
Davie, Florida 33328
(954) 727 – 1957
(954) 854 - 6004

## Education

Nova Southeastern University, Broward County Florida, Bachelor of Science, 1990

St. Thomas University School of Law, Miami-Dade County Florida, Juris Doctorate, 1993

Oxford University, Oxford England, PGDip — Global Business, 2017

## Certification

Certified as an Information Systems Auditor (CISA), Information Systems Audit and Control Association, 2002

Certified as an Information Security Manager (CISM), Information Systems Audit and Control Association, 2003

Certified in Computer Forensics, Oregon State University, 2003

Certified as an Access Data Certified Examiner (ACE), Access Data Corporation, 2009, 2015

Certified in Blockchain Essentials, eCornell, Cornell University, 2021

Forensic Explorer Certified Examiner (FEXCE), GetData Forensics, 2022

## Blockchain Training

- Cryptocurrencies and Ledgers, eCornell, Cornell University

- Blockchain Fundamentals, eCornell, Cornell University

- Cryptography Essentials, eCornell, Cornell University

- Applications of Blockchain Technology, eCornell, Cornell University

## ADA / Website Accessibility Training

- Web Accessibility: Learn the Best Practices, Tools, and Techniques

- Web Accessibility Testing – Selenium, BDD, Axe, Pally, Jaws, NVDA

- Responsive Web and Mobile Development in HTML, CSS & JavaScript

- Creating Accessible Websites

- HTML

- Create Mobile-Friendly Web Apps with HTML

- Web Content Accessibility Guidelines (WCAG) 2.1 Simplified

- Introduction to UX design for Accessibility and WCAG 2.0

- Technological Adaptability

- What to Look for in an Accessibility Audit

- The ROI of Digital Accessibility

- What to Expect from an Accessibility Audit

- Accessibility and Compliance: How to Measure Digital Accessibility

- Introduction to Screen Readers

- Android Native Mobility Accessibility

- IOS Native Mobile Accessibility

**Expert Witness Experience**

<u>United States of America v. Christopher Chappell,</u> In the United States District Court for the Southern District of Florida, Case No. 22-60148-CR-SMITH, testified at Sentencing Hearing as to the lack of CSAM on the Defendant's devices and to the condition of metadata from mobile devices that contradicted the testimony of the Government's witnesses.

<u>State of Florida v. Joseph Baldino,</u> In the Circuit Court of the 19th Judicial Circuit In and For St. Lucie County, Florida, Case No. 562011CF1300, Case on Appeal, Testified as to work I performed in support of Defendant's appeal.(Deposition)

<u>State of Florida v. Michael Tateishi,</u> In the Circuit Court of the 10th Judicial Circuit, In and For Polk County Florida, Case No. 2020-CF009494, testified as to the need to inspect evidence and the protocol for doing so when evidence contained CSAM. (Hearing)

<u>Dean Allen Burri, et al v. EBS South, Inc., et al,</u> In the Circuit Court of the 11th Judicial Circuit, in and for Miami-Dade County, Florida (Civil Division), Case No. 2021-004363-CA-01, Testified as to different issues that occurred in the case. (Multiple Hearings)

<u>Latasha West v. Moral Foods. LLC. ,</u> In the Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida, Case No.: CACE-14-017346 (09), Testified as to the process and analysis associated with surveillance video footage provided by Defendant. (Deposition)

<u>Coastal Construction Company of Palm Beach. Inc. d/b/a Coastal Construction of Palm Beach v. Roll Plumbing Company. Inc.,</u> In the Circuit Court for the 11th Judicial Circuit, In and for Miami-Dade County, Florida, Case No.: 08-56455-CA-23, Testified at Evidentiary Hearing regarding the destruction of data and the likelihood of valuable evidence existing if the hard drive had not been tampered with. (Evidentiary Hearing)

<u>Jason Lee and Fine Marketing Solutions. LLC v. Kenneth A. Orr, Evan H. Berger. Triumph Small Cap Fund. Inc. J.D. Lauren, Inc. Solar Grid Capitol. Inc. and Ecologix Resource Group, Inc.,</u> In the Circuit Court for the 11th Judicial Circuit, In and For Miami-Dade County, Florida, Case No.: 2012-031582-CA-OI, Testified at Evidentiary Hearing regarding the process for examining evidence. (Evidentiary Hearing)

<u>C.T. and L.T. individually and as parents and Guardians of B.T., a minor v. A.S. and M.S. and SS, a Minor,</u> In the United States District Court for the Southern District of Florida … Records Sealed. (Testified at Hearings)

<u>Mary Laurine Umstead v. Horizon Bay Mgt, LLC, et al.</u> In the Circuit Court of the 13th Judicial Circuit of the State of Florida in and For Hillsborough County, Circuit Civil, Testified at Trial as to whether or not the information contained in an Electronic Medical Record system was accurate and whether or not certain operational practices were followed. (Trial)

<u>In Re: Rothstein Rosenfeld and Adler,</u> US Bankruptcy Court for the Southern District of Florida, Case No. : 09-34791-BKC-RBR, Testified at Evidentiary Hearing to qualifications and to be appointed as the Court's expert. Accepted as an Expert and appointed to address complex technical issues facing the Court and issued a report on the same. (Evidentiary Hearing)

<u>United States of America v. Michael Meister,</u> United States District Court Middle District of Florida, Case No. 8:10-CR-339-T-26AEP, Testified at Evidentiary Hearing regarding the complex issues involved in the collection, and preservation, review, and analysis associated with the Governments case. (Evidentiary Hearing)

<u>United States of America v. William Vazquez Rivera,</u> In the United States District Court for the District of Puerto Rico, Criminal Number 09-361 (JAF), Testified at Trial regarding issues with identifying the specific location of a computer as well as identifying the individual who was at the computer at a specific date and time. (Trial)

<u>Mathew Beck. et al. y. Boce Group, LLC d/b/a Next Café. et al.</u> US District Court for the Southern District of Florida, Case No.: 04-20683-CIV-Cooke, testified regarding the destruction of computer data, the existence of an audit trail, and the possible manipulation of time-keeping records. (Deposition and Trial)

<u>Health Trio v. Ralph Korpman. et al.</u> In the Chancery Court for Davidson County, Tennessee, 20th Judicial District, Civil Action No., 05-559-111, Testified on the potential destruction of evidence, a possible violation of a court order preserving all information on the computer, and the possible destruction of evidence through the use of file scrubbing software. (Deposition and Trial)

<u>William P. Planes, Sr. y. Rocky Shirey. et al.,</u> In the Circuit Court for the 6th Judicial Circuit in and for Pinellas County, Florida, Case No.: 06-9077-CI-19, Testified at Evidentiary Hearing regarding issues involving the identification and preservation of data belonging to the Defendants. (Evidentiary Hearing)

<u>Jan Bronstein v. Marc Bronstein,</u> United States District Court, Southern District of Florida, Case No.: 0680656, Testified at deposition regarding the ownership and go-live date of a company's website and its domain. (Deposition)

<u>In Re: The Marriage of Stuart Pressman and Wendy Bulgrin.</u> In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No.: 06-008172, Testified on topics that included the collection, preservation, and processing of data stored within a Point-of-Sale System used by the couple's business and inventory issues. (Evidentiary Hearing, Deposition, and Trial)

<u>Building Education Corporation v. Jose Manuel Fernandez. et al.</u> In the Circuit Court of the 11th Judicial Circuit in and for Miami Dade County, Florida, Case No.: 03-15909 CA 09, Testified at Evidentiary Hearing providing information to the Court for possible selection as a neutral expert in the investigation and tracking ESI through a large IT infrastructure. (Evidentiary Hearing)

<u>Microsoft Corporation V. Big BQY Distribution. LLC/</u> In the United States District Court in and for the Southern District of Florida, Case No.: 07-80296-CIV-Hurley/Vitunac, testified at deposition regarding the examination of Plaintiff's expert's report and the methods used by the said expert in coming to their conclusions. (Deposition)

<u>Orlando/Orange County Expressway Authority v. Tuscan Ridge. et al.,</u> In the Circuit Court of the 9th Judicial Circuit in and for Orange County, Florida, Case No.: 2006-CA-006250-O, Testified at Evidentiary Hearing regarding establishing the true and correct Metadata information associated with computer files created by an expert in an Eminent Domain action. (Evidentiary Hearing)

<u>Med Qata Infotech USA, Inc. v. Unnikrishnan Thankappan. et al,</u> In the Circuit Court of the 6th Judicial Circuit in and for Pasco County, Florida. Case No.: 51-2004-CA-00321WS, testified at deposition regarding the contents of several hard drives containing information relating to computer software created by Plaintiff. (Deposition)

<u>Contractors. Inc. v. Turner Construction Company, et al.</u> In the Circuit Court of the 11th Judicial Circuit, in and for Miami-Dade County, Florida, Complex Business Litigation Section, Case No.: 02-32516CA-40, Testified at Evidentiary Hearing regarding addressing the collection, preservation, processing, analysis, and possible destruction of evidence. (Evidentiary Hearing)

<u>Benjamin J. Philips, Ill y. Oracle USA, Inc:</u> In the Circuit Court of the 4th Judicial Circuit, in and for Duval County, Florida, Case No.: 16-2007-CA-006905-XXXX-MA, Division CV-E, Testified at Evidentiary Hearing regarding issues surrounding the destruction of evidence from a company-owned laptop used by Plaintiff. (Evidentiary Hearing)

Jessica Lane v. Adam Gerry. In the Circuit Court for the 20th Judicial Circuit in and for Collier County, Florida, Civil Action No. 08-9521-CA, testified at deposition regarding issues surrounding the disappearance of a laptop and the information found on the device after it had been recovered. (Deposition)

The Florida Bar v. Jeremy W. Alters, In and for the Supreme Court of Florida (Before a Referee) Supreme Court Case No.: SC14-100, Testified at Trial regarding cellphone data being deleted and process for examining evidence. (Trial)

Teaching and lectures by Topic

- FBI Retired Agent's Event – "What one can recover from a mobile device."

- Adjunct Professor — IE Business School, Madrid Spain, master's in cyber security, my area of responsibility is in Digital Forensics and Computer Crimes.

- Computer Forensic Issues important to the Criminal Defense Bar. Private event sponsored by FDS. In May 2016, Event provided instruction on six different forensic challenges facing criminal defense attorneys in practice.

- Mobile Devices and BYOD/CYOD: the eDiscovery Challenges, Panelist, LawTech Europe Congress 2015 Conference, October 2015.

- The Lifecycle of Electronic Evidence - Have we Finally Got it Right? Panelist, LawTech Europe Congress 2015 Conference, October 2015.

- Cellular Phone Tracking Via Cell Towers - Dispelling the Postmortem Analysis Myth, 7th European Academy of Forensic Science Conference, September 2015.

- Digital Security and the Dangers Facing Every Employer, 7th European Academy of Forensic Science Conference, September 2015.

- Cellular Phone Tracking Via Cell Towers — Dispelling the Postmortem Analysis Myth, High Technology Crime Investigation Association, August 2015.

- 48 Hours of a Cyber Security Breach — What to Do from a Technical Standpoint: A First Responder Case Study, The Daily Business Review's Corporate Counsel Summit, May 2015.

- Data Security: What is a RAT? (Remote Access Trojan), Daily Business Review's Corporate Counsel Summit, November 2014.

- Data Security, Keeping Your Database, Customer Information and Other Proprietary Information Safe and What to Do If There Is A Security Breach, Daily Business Review's Corporate Counsel Summit, April 2013.

- Data Security, LawTech Miami, November 2013.

Publications

- Globalization and Data Protection — An Analysis of Practicality, PGDIP — Global Business, Oxford University, February 2017.

- Electronic Discovery — 21st Century Road map, Georgia Defense Lawyers Association Periodical, May 2006.

- Firms Face Forensic Challenge, South Florida Business Journal, May 2006.

- Electronic Discovery: A Smart Five-Step Approach, South Florida Legal Guide, November 2006, Reprinted 2007.

- What Every Business Needs to Know about Evidence Preservation and Electronic Discovery Issues, September 2007.

- Forensic Times Newsletter, 2007 & 2008. (Trade Publication produced by firm)

- Discovery Requests: Knowing when and how to proceed can save thousands and the case, Smart Business, May 2008.

- How to obtain information from an Internet Service Provider, 2016.

**PROOF OF SERVICE**
*Juan Alcazar, et al. v. Fashion Nova, Inc.*
3:20-cv-01434-TSH

I, Jennifer M. Mitchell, am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to this action. My business address is 3055 Wilshire Blvd., 12th Fl., Los Angeles, California 90010. My electronic service address is *jmitchell@wilshirelawfirm.com*. On **June 23, 2023**, I served the foregoing document described as:

**PLAINTIFF'S EXPERT DISCLOSURE PER FRCP 26(a)(2)(B)**

[✓]   **BY ELECTRONIC SERVICE:** Based on an agreement of the parties to accept electronic service, I caused the document(s) identified above to be sent to the person(s) at the electronic service addresses listed in the below Service List, pursuant to FRCP 5(b)(2)(E). I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Ryan L. Eddings
Bar No. 256519
*reddings@littler.com*
LITTLER MENDELSON, P.C.
5200 North Palm Avenue
Suite 302
Fresno, CA  93704–2225
Telephone:   559.244.7500
Facsimile:   559.244.7525

Kara Adelle Ritter Cole
Bar No. 306515
*kcole@littler.com*
LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, California 92101–3577
Telephone:   619.232.0441
Facsimile:   619.232.4302

*Attorneys for Fashion Nova, Inc.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this **June 23, 2023** at Los Angeles, California.

*/s/ Jennifer M. Mitchell*
Jennifer M. Mitchell

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

1
PROOF OF SERVICE

**U.S. Department of Justice**
# Civil Rights Division

# Guidance on Web Accessibility and the ADA

This guidance describes how state and local governments and businesses open to the public can make sure that their websites are accessible to people with disabilities as required by the Americans with Disabilities Act (ADA).

+Learn more about businesses' and state and local governments' ADA responsibilities.

## Why Website Accessibility Matters

**Inaccessible web content means that people with disabilities are denied equal access to information. An inaccessible website can exclude people just as much as steps at an entrance to a physical location. Ensuring web accessibility for people with disabilities is a priority for the Department of Justice. In recent years, a multitude of services have moved online and people rely on websites like never before for all aspects of daily living. For example, accessing voting information, finding up-to-date health and safety resources, and looking up mass transit schedules and fare information increasingly depend on having access to websites.**

People with disabilities navigate the web in a variety of ways. People who are blind may use screen readers, which are devices that speak the text that appears on a screen. People who are deaf or hard of hearing may use captioning. And people whose disabilities affect their ability to grasp and use a mouse may use voice recognition software to control their computers and other devices with verbal commands.

The ways that websites are designed and set up can create unnecessary barriers that make it difficult or impossible for people with disabilities to use websites, just as physical barriers like steps can prevent some people with disabilities from entering a building. These barriers on the web keep people with disabilities from accessing information and programs that businesses and state and local governments make available to the public online. But these barriers can be prevented or removed so that websites are accessible to people with disabilities.

EXHIBIT
13

## U.S. Department of Justice
# Civil Rights Division

# Examples of Website Accessibility Barriers

- **Poor color contrast.**  People with limited vision or color blindness cannot read text if there is not enough contrast between the text and background (for example, light gray text on a light-colored background).

- **Use of color alone to give information.**  People who are color-blind may not have access to information when that information is conveyed using only color cues because they cannot distinguish certain colors from others.  Also, screen readers do not tell the user the color of text on a screen, so a person who is blind would not be able to know that color is meant to convey certain information (for example, using red text alone to show which fields are required on a form).

- **Lack of text alternatives ("alt text") on images.**  People who are blind will not be able to understand the content and purpose of images, such as pictures, illustrations, and charts, when no text alternative is provided.  Text alternatives convey the purpose of an image, including pictures, illustrations, charts, etc.

- **No captions on videos.**  People with hearing disabilities may not be able to understand information communicated in a video if the video does not have captions.

- **Inaccessible online forms.**  People with disabilities may not be able to fill out, understand, and accurately submit forms without things like:
    - Labels that screen readers can convey to their users (such as text that reads "credit card number" where that number should be entered);
    - Clear instructions; and
    - Error indicators (such as alerts telling the user a form field is missing or incorrect).

- **Mouse-only navigation (lack of keyboard navigation).**  People with disabilities who cannot use a mouse or trackpad will not be able to access web content if they cannot navigate a website using a keyboard.

# When the ADA Requires Web Content to be Accessible

**The Americans with Disabilities Act applies to state and local governments (Title II) and businesses that are open to the public (Title III).**

**U.S. Department of Justice**
# Civil Rights Division

## State and local governments (Title II)

Title II of the ADA prohibits discrimination against people with disabilities in all services, programs, and activities of state and local governments.  State and local governments must take steps to ensure that their communications with people with disabilities are as effective as their communications with others.   Many state and local government services, programs, and activities are now being offered on the web.  These include, for example, things like:

- Applying for an absentee ballot;
- Paying tickets or fees;
- Filing a police report;
- Attending a virtual town meeting;
- Filing tax documents;
- Registering for school or school programs; and
- Applying for state benefits programs.

A website with inaccessible features can limit the ability of people with disabilities to access a public entity's programs, services and activities available through that website—for example, online registration for classes at a community college.

**For these reasons, the Department has consistently taken the position that the ADA's requirements apply to all the services, programs, or activities of state and local governments, including those offered on the web.**

## Businesses that are open to the public (Title III)

Title III prohibits discrimination against people with disabilities by businesses open to the public (also referred to as "public accommodations" under the ADA). The ADA requires that businesses open to the public provide full and equal enjoyment of their goods, services, facilities, privileges, advantages, or accommodations to people with disabilities.  Businesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.  For example, communication aids and services can include interpreters, notetakers, captions, or assistive listening devices.  Examples of businesses open to the public:

- Retail stores and other sales or retail establishments;
- Banks;
- Hotels, inns, and motels;
- Hospitals and medical offices;
- Food and drink establishments; and
- Auditoriums, theaters, and sports arenas.

**U.S. Department of Justice**

# Civil Rights Division

A website with inaccessible features can limit the ability of people with disabilities to access a public accommodation's goods, services, and privileges available through that website—for example, a veterans' service organization event registration form.

**For these reasons, the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web.**

## How to Make Web Content Accessible to People with Disabilities

**Businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication.  But they must comply with the ADA's requirements.**

The Department of Justice does not have a regulation setting out detailed standards , but the Department's longstanding interpretation of the general nondiscrimination and effective communication provisions applies to web accessibility.[1]

Businesses and state and local governments can currently choose how they will ensure that the programs, services, and goods they provide online are accessible to people with disabilities.

Existing technical standards provide helpful guidance concerning how to ensure accessibility of website features.  These include the Web Content Accessibility Guidelines (WCAG) and the Section 508 Standards, which the federal government uses for its own websites.  Check out the resources section for more references.

**Even though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities.**

---

[1] *See* 42 U.S.C. §§ 12132, 12182(a); 28 C.F.R. §§ 35.130, 35.160(a), 36.201, 36.303(c).

**U.S. Department of Justice**

# Civil Rights Division

Businesses and state and local governments should consider a variety of website features when ensuring that their websites are accessible.  The resources section has links to organizations that explain how to make websites accessible.  Examples of what businesses should do to make websites accessible include (but are not limited to) the following practices:

- **Color contrast in text.**  Sufficient color contrast between the text and the background allows people with limited vision or color blindness to read text that uses color.

- **Text cues when using color in text.**  When using text color to provide information (such as red text to indicate required form fields), including text cues is important for people who cannot perceive the color.  For example, include the word "required" in addition to red text for required form fields.

- **Text alternatives ("alt text") in images.**  Text alternatives convey the purpose of an image, including pictures, illustrations, charts, etc.  Text alternatives are used by people who do not see the image, such as people who are blind and use screen readers to hear the alt text read out loud.  To be useful, the text should be short and descriptive.

- **Video captions.**  Videos can be made accessible by including synchronized captions that are accurate and identify any speakers in the video.

- **Online forms.**  Labels, keyboard access, and clear instructions are important for forms to be accessible.  Labels allow people who are blind and using screen readers to understand what to do with each form field, such as by explaining what information goes in each box of a job application form.  It is also important to make sure that people who are using screen readers are automatically informed when they enter a form field incorrectly.  This includes clearly identifying what the error is and how to resolve it (such as an automatic alert telling the user that a date was entered in the wrong format).

- **Text size and zoom capability.**  People with vision disabilities may need to be able to use a browser's zoom capabilities to increase the size of the font so they can see things more clearly.

- **Headings.**  When sections of a website are separated by visual headings, building those headings into the website's layout when designing the page allows people who are blind to use them to navigate and understand the layout of the page.

- **Keyboard and mouse navigation.**  Keyboard access means users with disabilities can navigate web content using keystrokes, rather than a mouse.

- **Reporting accessibility issues.**  Websites that provide a way for the public to report accessibility problems allow website owners to fix accessibility issues.

**U.S. Department of Justice**

# Civil Rights Division

> **This is not a complete list of things to consider.**  There are many existing resources to help businesses and state and local governments with making websites accessible to people with disabilities, some of which are included at the end of this document.

# Web Accessibility for People with Disabilities is a Priority for the Department of Justice

When Congress enacted the ADA in 1990, it intended for the ADA to keep pace with the rapidly changing technology of our times.  Since 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.  As the sample cases below show, the Department is committed to using its enforcement authority to ensure website accessibility for people with disabilities and to ensure that the goods, services, programs, and activities that businesses and state and local governments make available to the public are accessible.

## Title II Sample Cases

- **Project Civic Access**: As part of the Department's Project Civic Access enforcement work, the Department has reached numerous agreements with cities and counties across the country that include web accessibility requirements.  For example, City and County of Denver, Colorado, City of Jacksonville, Florida, and City of Durham, North Carolina.

- **Miami University in Ohio**: The Department reached an agreement with Miami University in Ohio to resolve the United States' lawsuit alleging that the university discriminated against students with disabilities by providing inaccessible web content and learning management systems.

- **Nueces County, Texas**: The Department reached an agreement with Nueces County, Texas, to address claims that the County used an online conference registration form that was not accessible to people with disabilities who use software that reads text out loud.

- **Louisiana Tech**: The Department reached an agreement with Louisiana Tech University to address claims that the university violated the ADA by using an online learning product that was inaccessible to a blind student.

**U.S. Department of Justice**
# Civil Rights Division

## Title III Sample Cases

- **Rite Aid Corporation**: The Department reached an agreement with Rite Aid Corporation to address accessibility barriers in Rite Aid's COVID-19 Vaccine Registration Portal.

- **Teachers Test Prep, Inc.**: The Department reached an agreement with Teachers Test Prep, Inc., regarding complaints that the test prep company's online video courses did not provide captions and were inaccessible to people who are deaf.

- **HRB Digital and HRB Tax Group (H&R Block)**: The Department reached an agreement with H&R Block to address claims that the company failed to code its website so that individuals with disabilities could use assistive technology such as screen reader software, refreshable Braille displays, keyboard navigation, and captioning.

- **Peapod**: The Department reached an agreement with Peapod to address claims that its online grocery delivery services were not accessible to some individuals with disabilities.

# Resources

- 18F Accessibility Guide: a comprehensive accessibility guide with resources published by 18F, a digital services agency under the General Services Administration (GSA).

- Digital.gov: this site, which is part of the Technology Transformation Services at the GSA, has resources on design of products, devices, services, or environments for people with disabilities.

- Section 508 Information and Communication Technology Accessibility Standards: standards published by the U.S. Access Board addressing access to information and communication technology under Section 508 of the Rehabilitation Act of 1973.

- Section508.gov: a website published by the GSA with tools and training on implementing website accessibility requirements under Section 508.

- Web Content Accessibility Guidelines (WCAG): guidelines published by the Web Accessibility Initiative of the World Wide Web Consortium.